579 A.2d 744

**Tyrone Delano GILLIAM**

v.

**STATE of Maryland.**

**No. 150, Sept. Term, 1989.**

Court of Appeals of Maryland.

Sept. 25, 1990.

640

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender, Jerome E. Deise, Asst. Public Defender, all on brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and CHASANOW, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals of Maryland (Retired, Specially Assigned).

CHASANOW, Judge.

During the early morning hours of Saturday, December 3, 1988, the body of Christine Doerfler (Ms. Doerfler) was found slumped over the wheel of her Nissan Sentra automobile. She had been shot in the back of the head with a sawed-off shotgun. The following facts were adduced at the trial of Appellant, Tyrone D. Gilliam, Jr. (Gilliam).

On Thursday afternoon, December 1, Gilliam and the Drummond brothers, Kelvin LeGrant Drummond (Kelvin) and Delano Anthony Drummond (Tony), sat in a friend's apartment and got high on cocaine, marijuana, and alcohol. With them they had a sawed-off Winchester pump shotgun.

The three men talked about "what was going to happen, since [they] had the shotgun, and that is when Tony and Tyrone [Gilliam] came up with the idea of going to Harford County." They discussed their plans for "Friday and like fantasiz[ed] like what [they were] going to do. Tyrone [Gilliam] said that he was going to kill a bitch."

The next day, the threesome drove to Harford County in a Nova they had stolen earlier in the week. Each was wearing a stolen snowsuit and gloves taken from a sporting goods store Kelvin had recently burglarized. Gilliam carried the sawed-off shotgun inside his snowsuit.

After reaching Harford County at about 2:00 p.m., the three men visited a friend's apartment and "smoked some greens."[1] At about 6:00 p.m. they left the apartment, and with Kelvin behind the wheel, they drove the Nova to Baltimore County. There they stopped at the entrance of a townhouse development "[b]ecause [they were] planning on robbing somebody." Kelvin put on the hazard lights of the Nova, feigning trouble, and they waited for a victim.

Meanwhile, that same Friday night at approximately 7:00 p.m., Ms. Doerfler left her home in Baltimore City to make the 20–25 minute drive to her sister Nancy's townhouse in

---

1. According to the testimony of Kelvin Drummond, their "greens" were phencyclidine (PCP) smoked in a hand-rolled cigarette.

Baltimore County. At 7:12 p.m. she stopped en route at a nearby Erol's video store where she checked out a video-tape. She may also have made an additional stop at her brother's house, although this could not be confirmed because he was not home that evening.

Still waiting at the entrance of the townhouse complex, the three men watched as a car approached. This first car was driven by a man. Gilliam and Tony told Kelvin not to follow the car. At about 7:45 p.m., Ms. Doerfler pulled her Nissan Sentra into the parking lot of her sister's townhouse complex. The men had their victim.

As Ms. Doerfler pulled into a parking spot, Kelvin pulled the Nova in back of her Sentra. Ms. Doerfler was getting out of her car, but had not yet shut her door, when Tyrone and Tony jumped out of the Nova. They pushed their way into her car and forced her to drive down Belair Road while Kelvin followed in the Nova.

Because he was not certain of any plan, Kelvin signaled the lead car to join him in the rear lot of a Channel store. Both cars stopped and Tony got out of Ms. Doerfler's car to tell Kelvin that "she didn't have no money" but that she had a Signet bank card. Tony rejoined Gilliam and Ms. Doerfler in the lead car and the two cars continued to drive in tandem to find a Signet Bank. Eventually, they turned into Town and Country at the end of Gum Spring Road in Baltimore County.

The cars stopped, and Kelvin pulled the Nova beside Ms. Doerfler's Sentra. Tony Drummond then got out of the Sentra and took Ms. Doerfler's car keys with him. He joined his brother Kelvin in the Nova, leaving Ms. Doerfler alone with Gilliam.

The two brothers sat in the Nova talking and waited for Gilliam to join them. Kelvin testified that it was at this point that he looked up and saw Gilliam standing outside Ms. Doerfler's car on the driver's side. Ms. Doerfler was still sitting in the driver's seat. Kelvin could see Gilliam standing with one arm on the hood of Ms. Doerfler's car,

leaning down talking to her. In his other hand he held the shotgun, grasping it in the center on the pump area, his arm fully extended down. Kelvin then turned to his brother Tony for a cigarette. He testified:

"That is when I lit my cigarette up. That is when I heard this loud bang. You could see the flash. When I turned around, I couldn't see the girl. I could just see her hair and the coat. She was like face first into the steering wheel."

Gilliam quickly rejoined the brothers in the Nova and the three drove off, leaving Ms. Doerfler at the dead-end of Gum Spring Road. Kelvin asked Gilliam why he did it and Gilliam answered, "because she saw [my] face." They had stolen three dollars.

A few days later on December 5, 1988, at about 3:15 a.m., Trooper Gary D. Kulick of the Maryland State Police was on patrol in Harford County when he received a broadcast over his radio that an "incident"[2] had occurred near his patrol. He was told to look out for two cars driving on Route 40. Minutes later, Trooper Kulick spotted the cars—a gold, four-door, Toyota Camry followed by a Dodge Colt. The vehicles drove in tandem at a distance of about two to three car lengths and traveled at a speed of 50 m.p.h. in a posted 55 m.p.h. zone.

Trooper Kulick positioned his cruiser so that the approaching cars would not see him. He then received another broadcast which gave the license tag number of the Colt. He radioed the police barrack that he had spotted the cars and asked for back-up.

Deputy Buchannan of the Harford County Sheriff's Department came to his assistance. The Deputy signaled the Toyota Camry to pull off the road, which it did, and Kelvin Drummond was arrested.

---

**2.** The record reveals that Appellant and the Drummond brothers were involved in an armed robbery of a Shell mini-mart.

The Toyota, however, which Trooper Kulick attempted to stop, sped away. A high-speed pursuit ensued, reaching speeds of over 100 m.p.h. The chase ended only when the Toyota, unable to pass a pick-up truck, spun around and hit the median retainer wall head-on. The driver, bleeding from the forehead, was Gilliam.

Gilliam was arrested and his car searched. The search netted a loaded, sawed-off shotgun lodged between the front door and the driver's seat of the car. The shotgun had three shells in it.

At about 3:50 a.m., Trooper Kulick left the accident scene with Gilliam and took him to the Fallston General Hospital emergency room. Gilliam received treatment [3] and was visited by his mother. He was released from the hospital at 6:10 a.m.

Gilliam was taken to the Maryland State Police Barracks in Bel Air, Maryland, where he was directed to a holding cell. More than 12 hours after his arrest, at approximately 4:45 p.m., Gilliam was removed from his holding cell and walked 30 to 40 feet into an interview room where he was questioned by Corporal Ryan and Detective Naylor of the Baltimore County Police Department. Although Gilliam at first denied committing the murder, he ultimately confessed after being confronted with statements Kelvin Drummond had made to police. Gilliam made both oral and tape recorded confessions.

Gilliam was then charged with murder, robbery with a deadly weapon, kidnapping, and use of a handgun in the commission of a crime of violence. Pursuant to Maryland Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.), Article 27, § 412(b), the State timely notified Gilliam that if a conviction of first-degree murder was returned, it would seek the

---

**3.** Appellant was treated by Dr. Macvey, the attending physician in the emergency room, for the lacerations on his forehead. His forehead was disinfected and left unbandaged and he received a tetanus shot. In addition, x-rays were taken to insure that his neck and back were not injured. No pain-killing drugs were administered.

death penalty.[4] Kelvin Drummond was also indicted and pleaded guilty to first degree murder of Christine Doerfler. However, Kelvin Drummond made an agreement with the State that, if he testified for the State at Gilliam's trial, the State would recommend that Kelvin receive a sentence no more severe than life with the possibility of parole.

The Circuit Court for Baltimore County held a hearing on June 5, 1989, to consider Gilliam's motion to suppress his statements to police. The motion was denied. Presiding without a jury, the Circuit Court for Baltimore County (Fader, J.) conducted a trial on the merits on June 5–7, 1989.

The State's case against Gilliam consisted of three elements: The testimony of Kelvin Drummond; Gilliam's high-speed flight from police in a car containing a sawed-off shotgun; and Gilliam's statements made to police after he was brought into the police barracks. The trial court found Gilliam guilty of murder in the first degree (on theories of both premeditated murder and felony murder), guilty of robbery with a deadly weapon, guilty of kidnapping, and guilty of use of a handgun in the commission of a crime of violence.

The trial judge conducted a hearing on June 23, 1989 to determine whether Gilliam elected to be sentenced by the court or by a jury. Gilliam elected to be sentenced by the court.

On October 30–31, 1989, Judge Fader, sitting without a jury, found that Gilliam was a principal in the first degree of the murder of Christine Doerfler and, as an aggravating factor, found that the murder was committed during the course of a kidnapping, Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 413(d)(4), and robbery, Art. 27, § 413(d)(10). The court found no mitigating factors. Gilliam was sentenced to death. In his appeal to this Court pursuant to Md.Code

---

4. Alternatively, the State also timely notified Appellant that barring a sentence of death, it would seek life without the possibility of parole.

(1957, 1987 Repl.Vol.), Art. 27, § 414, Gilliam raises seven issues for our determination.

## FIRST–LEVEL FACTUAL FINDINGS AND MOTION TO SUPPRESS

█ The first issue raised by Gilliam in this appeal concerns the admissibility of statements he made to police during the interrogation after his arrest. Gilliam contends that the trial court erroneously failed to articulate the first-level factual findings underlying its determination that his statements were voluntary. According to Gilliam, the trial court's failure to make these findings constitutes reversible error.

In his brief Gilliam cites *Lodowski v. State*, 307 Md. 233, 513 A.2d 299 (1986) (*Lodowski II*) for the proposition that "a trial judge in ruling upon a motion to suppress a statement must resolve factual disputes not only for its own purposes, but also so as to permit an appellate court to engage in an independent constitutional review of the matter." While this may be an accurate statement of one of the holdings in *Lodowski II, id.* at 252–54, 513 A.2d at 310, Gilliam nonetheless has failed to bring to our attention any "factual disputes" raised at the suppression hearing. Quoting *Jackson v. Denno*, 378 U.S. 368, 391, 84 S.Ct. 1774, 1789, 12 L.Ed.2d 908, 924 (1964), this Court distinguished the situation in *Lodowski* from cases such as the instant one by stating:

> "[t]his is not a case where the facts concerning the circumstances surrounding the confession are undisputed and the task is only to judge the voluntariness of the confession based upon the clearly established facts and in accordance with proper constitutional standards."

*Lodowski II*, 307 Md. at 252, 513 A.2d at 309.

In *Lodowski II*, we noted numerous conflicts in the evidence, such as whether a waiver was signed on June 17 at 10:19 p.m. as police indicated or not until June 18 at 12:30 p.m. as Lodowski maintained. The evidence differed as to

what Lodowski and his mother were told regarding Lodowski's status as a suspect or witness, and his need for an attorney. In addition, due to the length of the interrogation, which extended from 10:15 p.m. June 17 until shortly after 6:00 a.m. the next morning, it was disputed whether Lodowski was capable of freely and knowingly waiving his rights due to a "sleep deprivation state." *Id.* at 253, 513 A.2d at 310. The trial judge made only one factual finding in *Lodowski II*—that Lodowski did not at any time request a lawyer.

In this appeal, Gilliam would have us find reversible error because the trial court did not make factual determinations about whether Gilliam understood the *Miranda*[5] warnings he received—particularly that he could cease interrogation once it had begun; whether Gilliam understood that he had a right to prompt presentment;[6] the amount and effect of the controlled substances Gilliam had ingested over the previous weekend; the effect of the head injury sustained during the car chase; and Gilliam's overall state of mind at the time he made the statements to police. However, Gilliam failed to raise these issues at the suppression hearing. Limited evidence was presented at the suppression hearing, and the facts were undisputed. Unlike *Lodowski II*, the evidence presented here did not require articulated factual determinations in order for an appellate court to conduct an independent constitutional appraisal. *See McIntyre v. State*, 309 Md. 607, 623–25, 526 A.2d 30, 37–39 (1987).

The hearing began with Corporal Joseph Ryan of the Maryland State Police, who was on duty at the state police barracks in Bel Air when Gilliam was brought in. Called by

---

5. The *"Miranda"* warnings were promulgated by the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. Detective Naylor testified that he obtained a waiver of the right to prompt presentment so that he could obtain a statement before Appellant was taken before a commissioner.

the State, Corporal Ryan testified that Gilliam was brought into the barracks on December 5, 1988, at approximately 6:30 a.m. and that:

> "he was handcuffed to the rear; he was under the direction of TFC Kulick, and ... had some type of head injury to his forehead. TFC Kulick directed him to a holding cell at the Barrack, at which time Mr. Gilliam followed those instructions to walk to the cell. He had to walk approximately 30, 40 feet to get to the cell, also to make a turn around a hallway to get into the cell and he did this under his own power."

Ryan further stated that Gilliam made no complaints about his head injury throughout the day. At about 2:30 p.m., Gilliam requested some food. The food was brought to him at about 3:05 p.m.

Gilliam was taken from his cell at 4:45 p.m. and walked approximately 30 feet to the interview room. The record shows that Gilliam had no trouble reading the *Miranda* warnings form aloud. Corporal Ryan stated that Gilliam was coherent and responsive, and that "he appeared to understand everything that was being said to him." After being asked whether he understood each right, Gilliam was asked to place his initials next to the *Miranda* right he was waiving. He initialed all of his *Miranda* rights. The interrogating officers had no reason to believe that Gilliam lacked the ability to fully comprehend the *Miranda* warnings and voluntarily elect to give a statement.

Nothing in Gilliam's testimony contradicted the testimony of Corporal Ryan. Gilliam did claim on direct examination, however, that he did not remember Corporal Ryan from the interrogation. Yet on cross-examination, he stated that he remembered speaking with Detective Naylor, the Baltimore County police officer who conducted the interrogation with Corporal Ryan. This at least demonstrates that he remembers being interrogated.

Gilliam also claimed that he did not understand his *Miranda* rights. He testified, "in a way I understood and in a

way I didn't." He explained that the only thing that he did not understand was that he could terminate the interview at any time. But when discussing the *Miranda* form he admitted: "I wasn't really paying attention to it when I was reading it. I was just reading it because they told me I had to read. I just wanted to get it over with." He stated that he signed the *Miranda* waiver, as well as the waiver of prompt presentment, because he "became impatient with the officers" and was feeling "uncomfortable."

Gilliam's voluntary inattentiveness does not undermine his decision to waive his *Miranda* rights. More importantly, Gilliam failed to raise at the hearing the possibility that his statements to police were made as a result of his drug use over the weekend. He says only that he felt "paranoid."

But even if Gilliam had argued that his waiver was involuntarily given due to prior drug use, we would point out here, as we have in a pre-*Miranda* decision, that as long as a statement is freely and voluntarily given at a time when the accused understands what he is saying, the fact that the accused may be under the influence of narcotics does not necessarily make the statement inadmissible. *Bryant v. State*, 229 Md. 531, 536, 185 A.2d 190, 192–93 (1962). The same would be true for any effects caused by the laceration on his forehead. *See Hadder v. State*, 238 Md. 341, 357, 209 A.2d 70, 79 (1965) (physical injury does not affect admissibility as long as the disclosure is freely and voluntarily made at a time when the accused knows and understands what he is saying).

■ *Lodowski II* makes it clear that "[t]he standard under which traditional voluntariness is to be measured is whether, under the totality of all of the attendant circumstances, the statement was given freely and voluntarily." *Lodowski II*, 307 Md. at 254, 513 A.2d at 310. Here, the trial judge was required only to determine whether the statements were voluntary under the facts. Gilliam did not offer and we find no evidence to support a contention that

he was incapable of understanding what was being said to him or understanding what he told police.

Perhaps the strongest indication of this is the hospital report. Gilliam was seen by a physician and other trained medical personnel directly after the car chase. The hospital report indicated that Gilliam was calm, not agitated, his speech clear, and that there was no alcohol on his breath. The report strongly suggests that Gilliam was capable of understanding what was going on around him shortly after his arrest. He then spent the next twelve hours in his cell, presumably drug-free, and was only then interrogated. On direct examination, Gilliam complained of nothing more serious than an "uncomfortable" feeling during the interrogation. Under the circumstances, we would be more surprised by a lack of discomfort. We find no error here.

## ELECTION TO REMAIN SILENT BOTH AT TRIAL AND AT SENTENCING

■ Gilliam next contends that he was affirmatively misadvised about his right to testify or to remain silent both at the trial and at the sentencing hearing, and that the court was required to, but did not, take corrective action. According to Gilliam, the court's failure in this regard was reversible error. The relevant proceedings at trial were as follows:

"MR. DANEMAN [Defense Attorney]: Stand up, Mr. Gilliam. If Your Honor please, at this time I would most respectfully like to advise my client of his right to testify or right to remain silent.

At this juncture of the case, the State having rested and the court having ruled on our motions, we have the privilege of going forth with testimony. You have the right to testify, sir. You have the right to remain silent. If you elect to remain silent, no inferences will be drawn from your refusal to testify. That means that this honorable court will not infer, *nor will the court find you guilty if you elect to remain silent;* do you understand that?" (Emphasis added.)

Counsel for Gilliam argues that Gilliam was told that he would not be found guilty if he elected to remain silent, and because this assertion was not reversed or negated by the trial judge, Gilliam may have been under the misapprehension that if he remained silent, and did not testify, the court would not find him guilty. Gilliam maintains that it was incumbent upon the trial judge to step in, correct any possible misapprehension, and ascertain whether Gilliam truly understood his options.

Similarly, Gilliam claims that he did not knowingly and intelligently waive his right to testify at the sentencing hearing. In that proceeding, defense counsel told Gilliam on the record that:

"At this juncture, sir, you have the right to testify or you have the right to remain silent. If you elect to remain silent, no inference of guilt may be drawn from your refusal to testify. *That means that His Honor would not find you guilty* or infer that you are guilty because you would like to remain silent; do you understand that?" (Emphasis added.)

Gilliam would have us believe that he interpreted this explanation of his right to testify or to remain silent "to mean that the court had not made a final determination as to his guilt," or that "if he elected to remain silent that the court could not consider the fact of his guilt in imposing sentence."

█ In *Stevens v. State,* 232 Md. 33, 192 A.2d 73, *cert. denied* 375 U.S. 886, 84 S.Ct. 160, 11 L.Ed.2d 115 (1963), this Court considered whether a defendant must be advised *by the court* of his right to elect not to testify. We held that where the accused has counsel, it should be presumed that he has been informed of his rights. *Id.* at 39, 192 A.2d at 77. In *Fowler v. State,* 237 Md. 508, 515, 206 A.2d 802, 806 (1965), this presumption remained undisturbed where the Court found "nothing in [the] record to indicate that the accused was not fully informed of his rights by counsel." Thus, only where it becomes clear to the trial court that the defendant does not understand the significance of his elec-

tion not to testify or the inferences to be drawn therefrom and where the presumption is rebutted must the court advise the accused of his right to testify or to remain silent.

Defense counsel's on-the-record explanation to Gilliam concerning his right to testify or to remain silent at trial is replete with references to previous discussions between defense counsel and his client, as well as his client's family, on the significance of the election not to testify. Indeed, defense counsel stated during the litany,

"MR. DANEMAN [Defense Attorney]: If you elect to testify, sir, you will be subject to cross-examination by the Assistant State's Attorney, the Court has a right to ask you questions and you must answer all questions truthfully, do you understand that?

THE DEFENDANT: Yes sir.

MR. DANEMAN: In addition, any prior record that you have involving crimes of moral turpitude could possibly be brought out for the purposes of impeaching your credibility or your believability as a witness; do you understand that?

THE DEFENDANT: Yes sir.

MR. DANEMAN: Now, we have discussed this many, many times, is that correct?

THE DEFENDANT: Yes, sir.

MR. DANEMAN: I discussed it with you yesterday, we discussed it today. I discussed it with your mother, your family seated behind you, that's correct?

THE DEFENDANT: Yes, sir.

MR. DANEMAN: Are you prepared to make an intelligent decision now as to whether or not you wish to testify or whether you wish to remain silent?

THE DEFENDANT: Yes.

MR. DANEMAN: What is your election, sir?

THE DEFENDANT: I wish to remain silent.

MR. DANEMAN: Is that a free and voluntary decision?

THE DEFENDANT: Yes, sir.

MR. DANEMAN: Has anybody, including myself, threatened you, harassed you, or induced you or told you not to testify?

THE DEFENDANT: No, sir.

MR. DANEMAN: We have reviewed this in depth, have we not?

THE DEFENDANT: Yes, sir.

MR. DANEMAN: Discussed the pros and cons of your testifying or not testifying, is that correct?

THE DEFENDANT: Yes, sir.

MR. DANEMAN: And we have discussed at length what possible benefits could be attained by your testifying, is that correct?

THE DEFENDANT: Yes, sir.

MR. DANEMAN: And we weighed that against the negative factors that could be developed if you testified, is that correct?

THE DEFENDANT: Yes, sir.

MR. DANEMAN: Do you feel that you have had ample time to review this decision; do you think you have had ample time to discuss this with me, with your family?

THE DEFENDANT: Yes, sir.

MR. DANEMAN: And you still wish to remain silent?

THE DEFENDANT: Yes, sir.

MR. DANEMAN: The defendant requests the right to remain silent."

Similarly at the sentencing hearing, defense counsel established on the record that he had repeatedly discussed with Gilliam the right to testify or to remain silent when he stated:

"MR. DANEMAN: ... We have discussed this many times, last Thursday, today, but it is a decision that you must make. I cannot make it for you; do you understand that?

THE DEFENDANT: Yes.

MR. DANEMAN: I know you discussed this with your mother because she was in my office when you called me Thursday night; you know that?

THE DEFENDANT: Yes.

MR. DANEMAN: Now, I asked you to reflect then and I ask you to reflect now. It is a major decision. Do you wish to testify or do you wish to remain silent?

THE DEFENDANT: I wish to remain silent.

MR. DANEMAN: That is your free and voluntary wish?

THE DEFENDANT: Yes.

MR. DANEMAN: No one, including myself, or anyone in court has threatened, harassed you, induced you to remain silent?

THE DEFENDANT: No.

MR. DANEMAN: How long have you thought about whether or not you wanted to testify or not?

THE DEFENDANT: I have thought about it for a while.

MR. DANEMAN: And you think you have had ample time to reflect on the pros and cons of testifying?

THE DEFENDANT: Yes.

MR. DANEMAN: And that is your final decision?

THE DEFENDANT: Yes.

MR. DANEMAN: You don't want to discuss it with your mother at any greater length?

THE DEFENDANT: No.

MR. DANEMAN: Defense rests."

The record thereafter reflects that Gilliam was told,

"If you elect to remain silent, no inference of guilt may be drawn from your refusal to testify. That means that His Honor would not find you guilty or infer that you are guilty because you would like to remain silent...."

■ We assume during the discussions alluded to in the on-the-record litany between Gilliam and his defense counsel, in the absence of any indication to the contrary, that defense counsel correctly informed Gilliam about the significance of his election not to testify both at trial and at

sentencing. The record does not support the highly unlikely inference that either Gilliam or his attorney actually believed that an election to remain silent at trial mandated acquittal, or that an election to remain silent at sentencing meant either that the court had not yet made a final determination as to his guilt or that the court could not consider the fact of his guilt when imposing sentence. The trial court was, therefore, not required to advise Gilliam of his right to remain silent at trial or at sentencing. Defense counsel's colloquies with Gilliam "on the record" explaining the right to remain silent and the choices to be made was a formality not required by any decision of this Court. During these gratuitous colloquies, Gilliam admitted that the election to testify or not testify had previously been reviewed "in depth," that he had considered and weighed the "possible benefits" against the "negative factors," and had further discussed the election with his family, as well as with his attorney. The record supports the conclusion that Gilliam fully understood the consequences of his election not to testify. There is no reason to conclude, and we do not conclude, that as the result of the ambiguous statement in the lengthy dialogue by defense counsel Gilliam believed that if he elected not to testify at trial he must be found not guilty, and that when that did not occur, if he elected not to testify at his sentencing hearing, he could not be sentenced to death. Where there is no indication that the defendant has a misperception of his right to remain silent and the effect of exercising that right, and where he expressly indicates he has been fully advised of and understands the right, as well as the effect of a waiver, then an ambiguous statement made by defense counsel during an "on the record" explanation does not result in reversible error if the trial court fails to intervene and clarify counsel's ambiguous statement.

## WAIVER OF JURY TRIAL

■ Again Gilliam contends that a potential ambiguity within the on-the-record litany is grounds for reversible

error. Gilliam asserts that his election to be tried by the court without a jury was not a knowing and intelligent election.

Preceding his election, the court advised Gilliam on the record about his right to be tried before a jury, or alternatively before the court without a jury. Gilliam argues that the court's advice was sufficiently ambiguous to have led him to believe that if he chose to be tried by a jury during the guilt/innocence phase of the trial and was convicted of murder in the first degree, then during the sentencing phase of the trial, he would automatically be sentenced by the same jury and precluded from being sentenced by a judge. The relevant portion of the proceedings is as follows:

"THE COURT: Sir, I want to give some advice of rights with regard to your right at this time to be tried before a jury or before the Court without a jury. At any time you don't understand any of these things that I'm explaining to you, please feel free to stop me and ask me to explain them in a different manner or to repeat them again. At any time that you want to confer with Mr. Daneman, you feel free to just stop me and also confer with him. Do you understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: First of all, I want to tell you that a jury is 12 citizens selected at random from the voting rolls of Baltimore County. They would sit in that jury box over there and listen to the evidence in the case. You and your attorney, Mr. Daneman, could help participate in the selection of that jury. The jury could not convict you unless all 12 of them, an unanimous verdict, 12 to nothing, were convinced that you were guilty beyond a reasonable doubt and to a moral certainty. That goes with regard to the conviction or the guilt/innocence stage of this trial, do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: You may also select a jury with regard to the sentencing phase of the trial if it gets to that. Now,

the Court, first of all, or the jury is going to listen to the evidence presented in this case and determine first of all if you are guilty of anything or what you are guilty of. And after the Court would determine that you would be guilty of murder, kidnapping, robbery with a dangerous and deadly weapon, or robbery, if a determination of guilt is made, then we go into the second phase of the trial. Of course, if you are found not guilty of any of those crimes, then that verdict disposes of the case and there is no sentencing portion of the case. Do you understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Now, throughout this explanation I'm going to have to make an assumption and I'm making it just for the sake of being able to advise you correctly and not because I believe that you are guilty, because frankly, sir, at this time I don't know much about the facts and circumstances of the case. All I know is what I have read as I have read the Court file and what has been told me this morning as a result of questioning and cross-examination that has occurred. So far, that constitutes very little. *But you are entitled with regard to both of these phases to elect a jury trial if you so desire and you may elect your jury trial or may elect to go without a jury and make a separate election with regard to both stages of this proceeding.*

The first stage which I will refer to as the guilt or innocence phase is—is in fact the defendant guilty or not guilty of the charges against him. *And if in fact a Court or jury determines that you are guilty, you can elect a jury trial or elect a Court trial with regard to the second phase of the proceeding, namely the sentencing phase.* If in fact you are convicted of murder in the first degree, then you have the right to elect whether it will be the jury or the judge that would sentence you, the sentence of course being either life imprisonment, life imprisonment without parole or death; do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: *Now, if in fact at this particular point you elect to be tried before a jury, then it would be that same jury in most cases and we make every effort to make sure it was in this case as we do in every case, that would also sit to determine whether you should receive a sentence of death or a sentence of life imprisonment or life imprisonment without parole. If in fact you decide at this point to elect a jury trial, then as I say, chances are it would be that jury who would also, if you would elect a jury trial, that would determine the sentence to be imposed.*

If you proceed at this time to elect to have myself as a judge conduct the trial on the guilt/innocence stage, then when it comes around to sentencing you could elect to have the case tried either before a jury or before a judge on the sentencing phase. A jury selected at that point would be the one to determine the proper sentence to be imposed and if I was elected at that point by yourself, I would determine the proper sentence to be imposed; do you understand that?

THE DEFENDANT: Yes, sir." (Emphasis added.)

Even this extensive extract of the record is not the entire relevant text. It is the beginning of 16 pages of transcript covering the court's advice to Gilliam on his right to choose to be tried either by a jury, or a court without a jury, at each phase of the trial. The last inquiry by the court before Gilliam made his election to waive a jury trial was:

"THE COURT: He understands that the election he is making at this time only is as to the guilt/innocence stage, that he has the right to make a separate election at the punishment stage, if we get to that point?

MR. DANEMAN: Okay. Strictly for the first phase of the trial; do you understand that?

THE DEFENDANT: Yes, sir."

The court repeatedly explained that the election for trial was independent of the election for sentencing. An on-the-

record inquiry enables the court to determine that the election is knowledgeable and voluntary. *Martinez v. State,* 309 Md. 124, 133, 522 A.2d 950, 954–55 (1987). This the court did. We, therefore, find no error.

### ELECTION TO BE SENTENCED BY THE COURT

■ The next issue raised by Gilliam in this appeal asserts two reasons why Gilliam's election to be sentenced by a court rather than by a jury was not knowingly and intelligently made. Gilliam claims he was misadvised about the sentencing that would result if the jury was deadlocked, and also about the deliberation process required by the Supreme Court in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

In *Harris v. State,* 295 Md. 329, 338–40, 455 A.2d 979, 984 (1983), we held that before a defendant may effectively waive a jury sentencing proceeding, he must be informed of the provisions of subsection (k)(2) of Md.Code (1957, 1987 Repl.Vol.), Art. 27 § 413, which states:

"If the jury, within a reasonable time, is not able to agree as to whether a sentence of death shall be imposed, the court may not impose a sentence of death."

Section 413(k)(6) states:

"If the State gives the notice required under § 412(b) of this article of intention to seek the death penalty in addition to the notice of intention to seek a sentence of imprisonment for life without the possibility of parole, and the court or jury determines that a sentence of death may not be imposed under the provisions of this section, that court or jury shall determine whether to impose a sentence of imprisonment for life or imprisonment for life without the possibility of parole."

If a jury is elected for sentencing, it is clear from these provisions that if after a reasonable period of time the jury is unable to agree about whether to impose a death sentence and thereby deadlocks, it is that same deadlocked jury

that decides whether the ensuing life sentence will be with or without the possibility of parole.

Before the trial began, the court advised Gilliam that: "The jury is only allowed a reasonable period of time to deliberate and after that reasonable period of time if they do not reach a decision one way or the other, then I'm required to bring the jury back to dismiss the jury and impose a sentence of life or *life imprisonment without parole.*" (Emphasis added.)

Gilliam asserts that this statement by the trial court was wrong as a matter of law because it suggested that both the deadlocked jury and the judge would have a chance to decide whether the ensuing sentence of life imprisonment would be with or without the possibility of parole. In other words, this potential ambiguity could have led Gilliam to think that if he elected to be sentenced by a jury "he would face a *double* possibility of life without parole. The jury would have the power to impose that sanction, but if it were to deadlock, then the *judge* could do so." The gist of this argument is that no one operating under such a misapprehension would elect a jury sentencing believing that it carried with it the potential to be twice exposed to a sentence of life without the possibility of parole. Therefore, Gilliam asserts his election to be sentenced by the court was not knowingly and intelligently made. We do not accept Gilliam's contention that his decision of whether a jury or judge would determine the sentence of life or death was affected by speculation on what would occur if the jury deadlocked on the issue of life or life without parole.

Even assuming Gilliam misunderstood this advice from the trial court when it was given to him before the trial on June 5, 1989, we think he was sufficiently advised of the distinction between a court and jury sentencing several weeks later in a hearing held on June 23, 1989, for the sole purpose of explaining these distinctions. The court stated at the June 23rd hearing:

"Now another thing, and the last thing. The State also has asked as an alternative for you to be sentenced to life

without parole. If a jury determines or if the judge determines as the sentencing trier of fact that you should receive life, then it would be up for the jury or the judge to determine whether that life sentence should be without parole. And the judge, if the judge would do the sentencing or the jury, if the jury would do the sentencing, would have to be convinced beyond a reasonable doubt and to a moral certainty, if life was to be imposed, that life sentence should be life without parole."

Because this adequately instructed Gilliam about the distinctions between a court and jury sentencing, we find no reversible error on this point.

■ The second point Gilliam raises in challenging his election to be sentenced by the court was that the trial court misadvised him of the jury deliberation process required by *Mills v. Maryland.* Gilliam maintains that the trial court failed to explain that if some, but less than all, of the jurors believed that at least one mitigating factor existed and was not outweighed by the aggravating factor(s), the result would be a deadlocked jury. Once deadlocked, the jury could not impose a sentence of death. The trial court explained:

"Suppose five jurors believe that one mitigating factor is in fact a mitigating factor but the other seven don't, and suppose seven other jurors agree upon another mitigating factor. All that is required is that the jury believe that some mitigating factor exists sufficient that they don't believe that the State has sustained its proof beyond a reasonable doubt and to a moral certainty that the aggravating factors outweigh the mitigating factors. In other words, the jurors do not have to agree unanimously on the same mitigating factor."

In *Mills,* the Supreme Court undertook to determine whether a reasonable juror understood the verdict form to mean that every time "no" was marked beside a mitigating factor the jury was indicating its unanimous conclusion that the defendant had not proved the relevant mitigating factor by a preponderance of the evidence, or instead, whether the

jury believed that a mark of "no" on the form indicated its failure to unanimously agree that a mitigating factor existed. This latter construction would prevent jurors from considering a mitigating factor which one or more, but not all, jurors believed existed. *Mills,* 486 U.S. at 375–76, 108 S.Ct. at 1866, 100 L.Ed.2d at 394–95. Concluding that there was a substantial risk the jury thought they were precluded from considering a mitigating factor unless all 12 jurors agreed on the existence of a particular mitigating factor, the Supreme Court remanded the case for resentencing. *Id.* at 384, 108 S.Ct. at 1870, 100 L.Ed.2d at 400.

Gilliam contends that the judge's example failed to advise him that the weighing of aggravating against mitigating circumstances occurs when one or more, but not all, jurors find that a mitigating circumstance exists. We find that, although a better example could have been chosen, the trial court's explanation was adequate.

While the trial court's *Mills* instruction may not have included every possible example of the jury deliberation process, it offered one example in which jury unanimity was not required on a single mitigating factor. This was not an erroneous instruction. More importantly, the record is clear that Gilliam discussed the significance of the *Mills* decision with his attorney, as well as its effect on his election to be sentenced by the court. Before trial, when Gilliam was to elect whether to be tried by the court or by a jury, the trial court instructed him on the *Mills* decision. The court then asked if Gilliam understood the instruction and the record shows the following:

"THE DEFENDANT: Yes, sir.

THE COURT: All right. Mr. Daneman, I take it you have been over this with your client before?

MR. DANEMAN: I have."

At no time did defense counsel object to the court's *Mills* instruction. Further, it is clear that Gilliam's attorney had already thoroughly instructed him on the matter. Therefore, absent clear evidence that Gilliam was in doubt about

the effect of *Mills* on his election to be tried and sentenced by the court, we presume that he was fully informed by his counsel. The ambiguity, if any, in the judge's explanation of *Mills* does not undermine the judge's finding of a knowing and voluntary election to be sentenced by the court.

## REJECTION OF "NOT CRIMINALLY RESPONSIBLE" PLEA

■ Citing *Treece v. State*, 313 Md. 665, 547 A.2d 1054 (1988), it is Gilliam's position that once a trial court is alerted to the fact that the defense has considered a plea of "not criminally responsible," the court is required to ascertain that the accused has personally concurred in the decision to abandon the plea. In *Treece*, we considered whether defense counsel or the defendant has the final say in determining whether a defense of "not criminally responsible" should be pursued. Here, Gilliam is raising a different issue: Whether an on-the-record litany is required whenever the court is aware that the defense of "not criminally responsible" has been considered.

It is hard to imagine a situation in which the defense of a serious homicide would not include at least consideration of a plea of "not criminally responsible." To accept Gilliam's position would be to require the court to make an on-the-record inquiry into the accused's personal decision to abandon a plea of "not criminally responsible" in virtually every homicide trial. This is not mandated either by Maryland Rule 4–242(a) or by *Treece*. Only where the court is made aware that there is a conflict between defense counsel and the accused about such a plea, should the trial court be required to ascertain through an on-the-record inquiry that the accused has voluntarily and intelligently made the personal decision to abandon the plea. *Treece* at 683, 547 A.2d at 1063.

■ In any event, there is no suggestion under the facts of this case that Gilliam did not, with the aid of counsel, personally reject a plea of "not criminally responsible."

Indeed, discussion of the issue between defense counsel and the court at the motions hearing offers sufficient basis for the court to have concluded that Gilliam had personally decided against a plea of "not criminally responsible." Defense counsel stated for the court that:

> "MR. DANEMAN: The only other issue that we wanted to cover is the fact that I reviewed with my client and his mother the issue of an NCR, not criminally responsible plea. I don't know if you want to address that issue now. I have reviewed my client's background, his psychological background and *we* have elected not to file that type of plea.
>
> THE COURT: All right.
>
> MR. DANEMAN: Record will reflect that." (Emphasis added.)

We find no conflict here. The record establishes that defense counsel discussed the plea option with his client and that Gilliam was included in the decision to forgo a plea of "not criminally responsible." The trial court was not aware of any dispute between defense counsel and Gilliam regarding rejection of such a plea. The trial court, therefore, did not err in declining to conduct an inquiry into the rejection of the plea.

## FINDINGS AND SENTENCING DETERMINATION SHEET

 The final issue raised by Gilliam is his allegation that the trial court, prior to final argument and allocution, made preliminary findings both on the matters of aggravating and mitigating factors, as well as Gilliam's status as a principal in the first degree. According to Gilliam, the court's use of the "Findings and Sentencing Determination" sheet prior to the final argument and allocution suggests that the court prematurely decided some of the issues. As a result, Gilliam maintains that he was deprived of his right to make his closing argument and allocution before a neutral tribunal.

The "Findings and Sentencing Determination" sheet used by the trial court consisted of a modified version of the form set out in Md.Rule 4–343. The form must be used whenever a sentence of death is sought under Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 413, Md.Rule 4–343(a); however, as will be discussed, it may be modified pursuant to section (f) of the rule.

On the second day of the sentencing hearing, the State and defense completed their presentation of evidence. After all evidence had been received, but before final argument and allocution, the following took place:

"THE COURT: Gentlemen and to the lady, unless there is anything else that we should go through first, I want to go through this findings and sentencing determination sheet today to make sure that there are no other corrections or suggestions that either of you have with regard to that.

MR. DANEMAN [Defense Attorney]: Yes, sir.

THE COURT: During the course of that, that will allow me to ask the defendant through his counsel what specific mitigating facts and circumstances you put forth so that you can in argument address yourself to those circumstances.

First of all, Section 1, based on the evidence I find that each of the following statements marked proven has been proven beyond a reasonable doubt and that each of the statements marked not proven has not been proven beyond a reasonable doubt: Number 1, that the defendant was a principal in the first degree to the murder; 2, that the defendant engaged or employed another person to commit the murder and that the murder was committed pursuant to an agreement or contract or remuneration or the promise of remuneration.

Certainly Number 2 is not proven and I don't think that the State is going to argue anything to the contrary, is that so?

MS. SHENNING [State's Attorney]: That's correct.

THE COURT: Is the defendant going to argue anything to the contrary that the defendant was a principal in the first degree to the murder?

MR. DANEMAN: No.

THE COURT: No argument on that point. *I will mark that point as proven.*

Based upon the evidence I find that the following statement—this is Section 2—if marked proven, has been proven by a preponderance of the evidence, or if marked not proven, it has not been proven by a preponderance of the evidence: At the time the murder was committed the defendant was mentally retarded. I have heard no evidence to that effect. Does the defendant intend to put forth any argument to that effect?

MR. DANEMAN: No, Your Honor.

THE COURT: *I will mark that as not proven.* Section 3. Based on the evidence, I find that each of the following aggravating circumstances that is marked proven has been proven beyond a reasonable doubt and I find that each of the aggravating circumstances marked not proven has not been proven beyond a reasonable doubt: Number 1, that the defendant committed the murder while committing or attempting to commit robbery. Number 2, that the victim was taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct. Does the defendant intend to present any argument that either or both of these circumstances has not been proven?

MR. DANEMAN: No, Your Honor.

THE COURT: *Then I will mark both of these circumstances as far as aggravating factors proven.*

MS. SHENNING: Your Honor, could we approach the bench?

THE COURT: Sure. Mr. Gilliam, you are welcome to come up here.

(WHEREUPON, there was a conference at the bench with the defendant present.)

MS. SHENNING: I understand that the Court is trying to sort of pare down the issues.

THE COURT: That is correct.

MS. SHENNING: And that is the purpose of this. But I would ask that the Court not actually make any findings until the entire argument, including the defendant's allocution, has been heard because that would all enter into the sentencing process. I believe that it would provide us with some guidance in crystallizing just what the issues are but not—

THE COURT: *I don't see any reason not to do that that way, Ma'am....*

All I'm asking is are you going to present any argument in this regard. You are not going to present any argument and you don't really have any contest about any of these things, do you?

MR. DANEMAN: I have no defense to it.

MS. SHENNING: Well, perhaps the defendant may wish to allocute and address some of these points, so that it would affect the Court's findings and that it would be—

MR. DANEMAN: *If he is going to allocute, I'm sure it is only with regard to the effect of drugs and maybe some problems he had growing up. But there is no way that we can disprove what occurred by his own confession.*

THE COURT: ... I'm going through and I'm asking what the situation is to clarify what the issues are here and I just can't imagine that somebody will say that I shouldn't do that. To my way of thinking, that is what I should be doing. *I should find out what is going on as far as this is concerned, including mitigating circumstances.*

I don't intend to make any findings with regard to the mitigating circumstances at this time, but as far as the aggravating circumstances, I mean, we are sitting here. We have been here for days. I have lived with this case. You have lived with this case. Certain things are at issue

in this case and certain are not. I can't imagine the appellate court treating it any differently.

* * * * * *

All right. I appreciate your position but I think I will just continue to go through and see what the situation is.

MS. SHENNING: All right. *But the Court doesn't intend to make any findings with regard to the mitigating circumstances?*

THE COURT: *No.* I intend to discuss these things now at this time." (Emphasis added.)

The sentencing judge then went on to review, but make no findings on, the statutory mitigating circumstances. Then the following occurred in open court with Gilliam present:

"THE COURT: Those are all of the other statutory factors. What else was the defendant intending to argue with regard to this? *What else does the defendant want me to consider as regards to be mitigating factors?*

MR. DANEMAN: If Your Honor please, with regard to mitigation, I have presented, tried to present in capsule form my client's entire life from the time his mother carried him, he was born, put on the relatives who testified to his emotional problems—

THE COURT: *So, consideration—*

MR. DANEMAN: Yes.

THE COURT:—*of entire life.*

MR. DANEMAN: That's right.

THE COURT: *Emotional problems.*

MR. DANEMAN: Drug abuse.

THE COURT: Well, are you going to consider drug abuse as a separate category or consider it all within here?

MR. DANEMAN: It will be separate but it will over—

THE COURT: *I'm going to make 8, consideration of his entire life, emotional problems. I will make number 9, drug use.*

MR. DANEMAN: Thank you.

THE COURT: *What else do you want me to consider?*
MR. DANEMAN: *That is it, Your Honor."*

Gilliam first asserts that the trial judge erred in making sentencing "findings and conclusions" prior to final argument and allocution. He contends that these "premature" determinations deprived him of the opportunity to address a closing argument and allocution to a neutral tribunal. While we do not condone the trial judge's "premature" determinations and conclusions, they do not constitute reversible error in the instant case.

The judge initially attempted to tailor the sentencing form to the issues before the court. The rules allow tailoring of the form. Section (f) of Rule 4–343 states:

> **Deletions from Form.—**Section II of the form set forth in section (e) of this Rule [whether by a preponderance of the evidence the defendant was found to be mentally retarded] shall not be submitted to the jury unless the issue of mental retardation is generated by the evidence. Unless the defendant requests otherwise, Section III of the form shall not include any aggravating circumstance that the State has not specified in the notice required under Code, Article 27, § 412(b)(1) of its intention to seek a sentence of death. Section VII of the form shall not be submitted to the jury unless the State has given the notice required under Code, Article 27, § 412(b)(2) of its intention to seek a sentence of imprisonment for life without the possibility of parole."

Thus, some tailoring of the form is not only permitted by Rule 4–343(f), but required by it. Further, the committee note following the rule states that omission of some of the aggravating circumstances from the form is not intended to preclude argument by the defendant concerning the absence of those circumstances.

The trial judge, however, went further than merely tailoring the sentencing form. He made the following findings: 1) that the Defendant "was a principal in the first degree to the murder;" 2) that at the time of the murder the Defen-

dant was not mentally retarded; 3) that the Defendant committed murder while committing or attempting to commit a robbery; and 4) that the murder was committed in the course of a kidnapping or abduction.

A trial judge should make no findings of fact on contested issues before counsel has had full opportunity to argue the issues. In the instant case, all the evidence had been presented on the four issues and defense counsel had told the judge that there would be no argument on these issues. The reason why there was to be no argument on these issues was, as counsel later concluded, that there was no evidence to support a contrary finding and that "there is no way that we can disprove what occurred by his own confession." The court below, knowing that all the evidence was in and upon being told there would be no argument on these four issues, saw no reason to delay deciding the issues. We can understand how the judge, in an attempt to focus on the contested issues, wished to initially eliminate the issues which were not contested and would not even be addressed in argument. Still, the better practice would be to wait and decide all issues at the same time.

Gilliam contends that the court's "premature findings and conclusions" compel reversal because "the defense was denied the opportunity to address a closing argument to a neutral tribunal," citing *Spence v. State*, 296 Md. 416, 463 A.2d 808 (1983). The short answer to Gilliam's contention is that Gilliam was not denied the opportunity to make a closing argument on these issues because Gilliam, through counsel, informed the judge that there would be no closing argument on these issues. *Spence* is inapposite to these circumstances. In *Spence*, the trial judge made a premature determination on the ultimate issue—that the defendant was guilty—without affording counsel the opportunity to make closing argument. The trial court's premature determination did not permit defense counsel any opportunity to make closing argument prior to the decision.

Defense counsel made it clear at his first opportunity to do so that he desired to make a closing argument on the issue of guilt. In the instant case, counsel had, immediately before the court's decision, expressly represented to the court that there would be no argument on these issues. Counsel was clearly not denied the opportunity, counsel expressly waived the opportunity, to make a closing argument prior to the court's decision on these issues.

Gilliam further contends that, even though counsel had indicated to the court in his presence that "the Defendant" did not intend to "argue anything to the contrary," still during allocution he might have wished to challenge the State's evidence on the four issues decided by the court. Gilliam asserts that because of the "premature" finding on these issues, his "right to full consideration of his allocution was impaired." If Gilliam wished to contest the issues during allocution he had an obligation to say something when the judge specifically asked if "the Defendant was going to argue anything to the contrary" and his counsel responded "no." In addition, Gilliam offered no objection when his counsel represented to the judge that if Gilliam was going to "allocute" it would only be "with regard to the effect of drugs and maybe some problems he had growing up, but there is no way we can disprove what occurred by his own confession." It was obvious that there was to be neither argument nor allocution on the four issues that were the subject of the early determination by the court. In the particular circumstances of the instant case, we find that the trial judge's error in making "premature" findings was harmless beyond a reasonable doubt. *Bowers v. State*, 306 Md. 120, 155–56, 507 A.2d 1072, 1090, *cert. denied*, 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986); *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

Gilliam also asserts that the sentencing judge's preliminary determination constituted an impermissible restriction on the consideration of non-statutory mitigating circumstances in violation of *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In fact, the

court made *no* preliminary determination with respect to the "other" mitigating circumstances. Rather, the court asked defense counsel what "other" mitigating circumstances counsel wished the court to consider, and the court wrote down for later consideration *every* "other" mitigating circumstance proffered. At no time did the judge indicate that he would limit the mitigating circumstances to those suggested by defense counsel. Indeed, at the conclusion of the proceeding, after the court considered the statutory mitigating circumstances and the "other" mitigating circumstances listed and found no mitigating circumstance to exist, the court further considered whether "there [is] any circumstances or circumstance under which I feel that the death penalty is inappropriate." Then the judge concluded that "death" was the appropriate sanction. The record clearly reflects that there was no impermissible or premature restriction on the consideration of any evidence in mitigation.

Finally, Gilliam does not raise the issue, but we are required by Art. 27, § 414(e) to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. Our analysis indicates that death penalty sentences have been imposed in a significant number of cases where the aggravating circumstances involved a murder in the course of a robbery and/or kidnapping. Considering both this defendant and the brutal nature of his crime, we conclude that the death sentence was neither excessive nor disproportionate to the penalty imposed in similar cases. *Collins v. State*, 318 Md. 269, 300, 568 A.2d 1, 16 (1990). We further conclude that Gilliam's death sentence was not imposed under the influence of passion, prejudice, or other arbitrary factors. Art. 27, § 414(e)(1).

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY AFFIRMED.