483 U.S. 1026
 107 S.Ct. 3248
 97 L.Ed.2d 774
 William "Billy" MITCHELL
v.
Ralph KEMP, Warden
 No. 85-5534
 Supreme Court of the United States
 June 26, 1987
 
 On petition for writ of certiorari to the United States Court of Appeals for the Eleventh Circuit.
 The petition for a writ of certiorari is denied.
 Justice MARSHALL, with whom Justice BRENNAN and Justice BLACKMUN join, dissenting from denial of certiorari.
 
 
 1
 In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court held that the Sixth Amendment's promise of effective assistance of counsel is not breached unless the criminal defendant can show that his attorney's conduct fell beyond the bounds of professional competence and thereby prejudiced his defense. Id., at 687, 104 S.Ct., at 2064. Since Strickland was decided, the Court has never identified an instance of attorney dereliction that met its stringent standard. Most recently, this Court rejected a claim that inadequate investigation of mitigating circumstances constituted ineffective assistance of counsel in a capital case. See Burger v. Kemp, --- U.S. ----, 107 S.Ct. 3114, 95 L.Ed.2d ---- (1987). Lest we permit the lower courts to conclude that the Sixth Amendment guarantees no more that that "a person who happens to be a lawyer is present at trial alongside the accused"—a notion expressly disavowed in Strickland, supra, 466 U.S., at 685, 104 S.Ct., at 2063—the Court should now give life to the Strickland standard. Accordingly, I would grant certiorari to consider the substantial allegation that counsel's performance, before the tribunal that sentenced petitioner to die, fell short of minimally effective representation.
 
 
 2
 * On November 5, 1974, petitioner pleaded guilty to the murder of a 14-year-old boy in the course of a convenience-store robbery. At the sentencing proceeding conducted without a jury, the State called five witnesses and introduced documentary evidence in support of its contention that petitioner should receive the death penalty. Defense counsel called no witnesses and presented no mitigating evidence. The court sentenced petitioner to die. After affirmance of his conviction, petitioner sought a writ of habeas corpus on the ground that he was denied effective assistance of counsel at the sentencing phase of his trial. The District Court concluded that the "tactical decisions" of petitioner's counsel were professionally reasonable. Mitchell v. Hopper, 564 F.Supp. 780, 786 (SD Ga.1983). The Court of Appeals, acknowledging that counsel's performance raised a "difficult question," nevertheless affirmed on the ground that it was the result of strategic choices. 762 F.2d 886, 889-890 (CA11 1985).
 
 
 3
 The habeas corpus record before the District Court demonstrates that petitioner's appointed attorney made no attempt to interview any potential mitigating witnesses. Record, Vol. V, pp. 21-22. He spoke to no member of petitioner's family, with the exception of petitioner's father, with whom he spoke by telephone on two occasions. Counsel apparently initiated these contacts for the purpose of requesting that the family hire an attorney to relieve him of his obligation to represent petitioner. Id., at 23-23. Counsel made no inquiries into his client's academic, medical, or psychological history.
 
 
 4
 Nor did counsel pursue a vigorous defense with respect to the circumstances of the crime. He did not interview the police officer who witnessed petitioner's confession, which the state used to establish the existence of certain aggravating circumstances in support of the death sentence, even though petitioner had told him that the officer—the cousin of the victim had held a gun to petitioner's head to extract the confession. Counsel's reason for not speaking to the officer was that, "I personally don't like the man." Record, Vol. VI, p. 35. Counsel did not interview the sole witness to the crime, who provided the key testimony for the prosecution at sentencing. Id., at 37. He filed no pretrial motions on petitioner's behalf. Id., at 45.
 
 
 5
 Counsel's failure to investigate mitigating circumstances left him ignorant of the abundant information that was available to an attorney exercising minimal diligence in fighting for Billy Mitchell's life. The affidavits of individuals who would have testified on petitioner's behalf fill 170 pages of the record in the District Court. Among these potential witnesses are family members, a city councilman, a former prosecutor, a professional football player, a bank vice-president, and several teachers, coaches, and friends.
 
 
 6
 Had defense counsel tapped these resources, he would have been able to present the sentencing judge with a picture of a youth who, despite growing up in "the most poverty-stricken and crime-ridden section of Jacksonville, Florida," Record 989, had impressed his community as a person of exceptional character. He had been captain of the football team; leader of the prayer before each game; an above-average student; an active member of the student council, school choir, church choir, glee club, math club, and track team; a boy scout; captain of the patrol boys; and an attendant to the junior high school queen.
 
 
 7
 Examples of the favorable impression that petitioner left on his community abound in the record. One such example is the statement of petitioner's former teacher and athletic coach at Butler High School:
 
 
 8
 "To understand what an exceptional person Billy Mitchell was at that time, one must understand that, while a comprehensive high school, Butler at the time was a segregated school in the middle of a very impoverished area—what might be called today a ghetto. In that locale and setting, Billy Mitchell was a rarity because of the exceptional character he displayed at Butler." Record 958-959.
 
 
 9
 Acquaintances and professionals described petitioner as "the type of person people naturally got along with," id., at 967; "the kind of person you could depend on for assistance in everything," id., at 956; "a hard worker who devoted a lot of time to school activities, especially activities involving younger kids," id.; "a fine student and athlete," id., at 980; a person of "character and personality . . . so atypical for someone convicted of a serious crime," id., at 1001; "not . . . the type of person that should be executed and given no further chance to live out a meaningful life," id., at 967. Petitioner's sisters explained that petitioner took care of his eleven brothers and sisters while his mother worked, id., at 953, and that petitioner took a job in the eighth grade to help support his family, id., at 941.
 
 
 10
 An account of what happened to this well-adjusted young person was also readily available to anyone who took the time to ask. When petitioner was 16 years old, his parents were divorced, and soon thereafter petitioner got into trouble. He and two friends were arrested for attempted robbery. Petitioner professed his innocence, but was persuaded by his father to plead guilty, id., at 948, because "things would go easier for him," id., at 963. The charges against the two friends were dropped. Petitioner was sentenced to six months in prison, where he was subjected to repeated violent homosexual attacks, experienced severe depression, and lost 30 pounds. Id., at 996-997. When he was re-