629 A.2d 685

**Tyrone Delano GILLIAM**

v.

**STATE of Maryland.**

**No. 139, Sept. Term, 1992.**

Court of Appeals of Maryland.

Aug. 25, 1993.

652

Nancy M. Cohen, Asst. Public Defender (Stephen E. Harris, Public Defender, Larry Polen, Assigned Public Defender, all on brief), Baltimore, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Sarah E. Page, Asst. Atty. Gen., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

Following a court trial in the Circuit Court for Baltimore County (Fader, J.), Tyrone D. Gilliam was found guilty of first degree murder of Christine Doerfler, robbery with a dangerous and deadly weapon, kidnapping, and related weapons offenses. The State notified Gilliam of its intent to seek the death penalty, and Gilliam elected to be sentenced by the court. Almost five months after the trial, a sentencing hearing was held before Judge Fader, and, as a result of that hearing, Gilliam was sentenced to death for the murder of Ms. Doerfler.

On direct appeal, this Court affirmed the conviction and sentence. *Gilliam v. State*, 320 Md. 637, 579 A.2d 744 (1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). Gilliam filed a petition for post conviction relief, and a

hearing was held on that petition. The circuit court, Turnbull, J., issued an opinion and order denying post conviction relief. This Court granted Gilliam's application for leave to appeal from the denial of post conviction relief.

The facts that led to Gilliam's conviction and sentence were set out in Gilliam's first appeal.

"During the early morning hours of Saturday, December 3, 1988, the body of Christine Doerfler (Ms. Doerfler) was found slumped over the wheel of her Nissan Sentra automobile. She had been shot in the back of the head with a sawed-off shotgun. The following facts were adduced at the trial of Appellant, Tyrone D. Gilliam, Jr. (Gilliam).

On Thursday afternoon, December 1, Gilliam and the Drummond brothers, Kelvin LeGrant Drummond (Kelvin) and Delano Anthony Drummond (Tony), sat in a friend's apartment and got high on cocaine, marijuana, and alcohol. With them they had a sawed-off Winchester pump shotgun.

The three men talked about 'what was going to happen, since [they] had the shotgun, and that is when Tony and Tyrone [Gilliam] came up with the idea of going to Harford County.' They discussed their plans for 'Friday and like fantasiz[ed] like what [they were] going to do. Tyrone [Gilliam] said that he was going to kill a bitch.'

The next day, the threesome drove to Harford County in a Nova they had stolen earlier in the week. Each was wearing a stolen snowsuit and gloves taken from a sporting goods store Kelvin had recently burglarized. Gilliam carried the sawed-off shotgun inside his snowsuit.

After reaching Harford County at about 2:00 p.m., the three men visited a friend's apartment and 'smoked some greens.' At about 6:00 p.m. they left the apartment, and with Kelvin behind the wheel, they drove the Nova to Baltimore County. There they stopped at the entrance of a townhouse development '[b]ecause [they were] planning on robbing somebody.' Kelvin put on the hazard lights of the Nova, feigning trouble, and they waited for a victim.

\* \* \* \* \* \*

Still waiting at the entrance of the townhouse complex, the three men watched as a car approached. This first car was driven by a man. Gilliam and Tony told Kelvin not to follow the car. At about 7:45 p.m., Ms. Doerfler pulled her Nissan Sentra into the parking lot of her sister's townhouse complex. The men had their victim.

As Ms. Doerfler pulled into a parking spot, Kelvin pulled the Nova in back of her Sentra. Ms. Doerfler was getting out of her car, but had not yet shut her door, when Tyrone and Tony jumped out of the Nova. They pushed their way into her car and forced her to drive down Belair Road while Kelvin followed in the Nova.

Because he was not certain of any plan, Kelvin signaled the lead car to join him in the rear lot of a Channel store. Both cars stopped and Tony got out of Ms. Doerfler's car to tell Kelvin that 'she didn't have no money' but that she had a Signet bank card. Tony rejoined Gilliam and Ms. Doerfler in the lead car and the two cars continued to drive in tandem to find a Signet Bank. Eventually, they turned into Town and Country at the end of Gum Spring Road in Baltimore County.

The cars stopped, and Kelvin pulled the Nova beside Ms. Doerfler's Sentra. Tony Drummond then got out of the Sentra and took Ms. Doerfler's car keys with him. He joined his brother Kelvin in the Nova, leaving Ms. Doerfler alone with Gilliam.

The two brothers sat in the Nova talking and waited for Gilliam to join them. Kelvin testified that it was at this point that he looked up and saw Gilliam standing outside Ms. Doerfler's car on the driver's side. Ms. Doerfler was still sitting in the driver's seat. Kelvin could see Gilliam standing with one arm on the hood of Ms. Doerfler's car, leaning down talking to her. In his other hand he held the shotgun, grasping it in the center on the pump area, his arm fully extended down. Kelvin then turned to his brother Tony for a cigarette. He testified:

'That is when I lit my cigarette up. That is when I heard this loud bang. You could see the flash. When I turned

around, I couldn't see the girl. I could just see her hair and the coat. She was like face first into the steering wheel.'

Gilliam quickly rejoined the brothers in the Nova and the three drove off, leaving Ms. Doerfler at the dead-end of Gum Spring Road. Kelvin asked Gilliam why he did it and Gilliam answered, 'because she saw [my] face.' They had stolen three dollars.

A few days later on December 5, 1988, at about 3:15 a.m., Trooper Gary D. Kulick of the Maryland State Police was on patrol in Harford County when he received a broadcast over his radio that an 'incident' had occurred near his patrol. He was told to look out for two cars driving on Route 40. Minutes later, Trooper Kulick spotted the cars— a gold, four-door, Toyota Camry followed by a Dodge Colt. The vehicles drove in tandem at a distance of about two to three car lengths and traveled at a speed of 50 m.p.h. in a posted 55 m.p.h. zone.

Trooper Kulick positioned his cruiser so that the approaching cars would not see him. He then received another broadcast which gave the license tag number of the Colt. He radioed the police barrack that he had spotted the cars and asked for back-up.

Deputy Buchannan of the Harford County Sheriff's Department came to his assistance. The Deputy signaled the Toyota Camry to pull off the road, which it did, and Kelvin Drummond was arrested.

The Toyota, however, which Trooper Kulick attempted to stop, sped away. A high-speed pursuit ensued, reaching speeds of over 100 m.p.h. The chase ended only when the Toyota, unable to pass a pick-up truck, spun around and hit the median retainer wall head-on. The driver, bleeding from the forehead, was Gilliam.

Gilliam was arrested and his car searched. The search netted a loaded, sawed-off shotgun lodged between the front door and the driver's seat of the car. The shotgun had three shells in it.

At about 3:50 a.m., Trooper Kulick left the accident scene with Gilliam and took him to the Fallston General Hospital emergency room. Gilliam received treatment and was visited by his mother. He was released from the hospital at 6:10 a.m.

Gilliam was taken to the Maryland State Police Barracks in Bel Air, Maryland, where he was directed to a holding cell. More than 12 hours after his arrest, at approximately 4:45 p.m., Gilliam was removed from his holding cell and walked 30 to 40 feet into an interview room where he was questioned by Corporal Ryan and Detective Naylor of the Baltimore County Police Department. Although Gilliam at first denied committing the murder, he ultimately confessed after being confronted with statements Kelvin Drummond had made to police. Gilliam made both oral and tape recorded confessions.

Gilliam was then charged with murder, robbery with a deadly weapon, kidnapping, and use of a handgun in the commission of a crime of violence. Pursuant to Maryland Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.), Article 27, § 412(b), the State timely notified Gilliam that if a conviction of first-degree murder was returned, it would seek the death penalty. Kelvin Drummond was also indicted and pleaded guilty to first degree murder of Christine Doerfler. However, Kelvin Drummond made an agreement with the State that, if he testified for the State at Gilliam's trial, the State would recommend that Kelvin receive a sentence no more severe than life with the possibility of parole.

The Circuit Court for Baltimore County held a hearing on June 5, 1989, to consider Gilliam's motion to suppress his statements to police. The motion was denied. Presiding without a jury, the Circuit Court for Baltimore County (Fader, J.) conducted a trial on the merits on June 5–7, 1989.

The State's case against Gilliam consisted of three elements: The testimony of Kelvin Drummond; Gilliam's high-speed flight from police in a car containing a sawed-off shotgun; and Gilliam's statements made to police after he

was brought into the police barracks. [The defense evidence consisted of four character witnesses, at least one of whom opined that, based on Gilliam's good character, the shooting must have been accidental.] The trial court found Gilliam guilty of murder in the first degree (on theories of both premeditated murder and felony murder), guilty of robbery with a deadly weapon, guilty of kidnapping, and guilty of use of a handgun in the commission of a crime of violence.

The trial judge conducted a hearing on June 23, 1989 to determine whether Gilliam elected to be sentenced by the court or by a jury. Gilliam elected to be sentenced by the court.

On October 30–31, 1989, Judge Fader, sitting without a jury, found that Gilliam was a principal in the first degree of the murder of Christine Doerfler and, as an aggravating factor, found that the murder was committed during the course of a kidnapping, Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 413(d)(4), and robbery, Art. 27, § 413(d)(10). The court found no mitigating factors. Gilliam was sentenced to death." (Footnotes omitted).

*Gilliam*, 320 Md. at 642–45, 579 A.2d at 746–48. Additional facts will be set forth in our discussion of the issues raised by Gilliam in this appeal.

## I. Was Gilliam denied his Sixth Amendment Right to Effective Assistance of Counsel

Throughout pretrial motions, trial, and sentencing, Gilliam was represented by Donald Daneman, a privately retained counsel. Following his sentencing and appeal and after a meticulous scrutiny of Daneman's representation, Gilliam, now represented by the Office of the Public Defender, filed a petition for post conviction relief under Maryland Code (1957, 1992 Repl.Vol.), Article 27, § 645A. In his petition for post conviction relief and subsequent appeal of its denial, Gilliam fires a salvo of accusations of ineffective assistance of counsel. A few of them are patently frivolous. One example is the complaint that "Daneman neglected to consult with an expert

on sleep deprivation" prior to the hearing on the motion to suppress Gilliam's confession. Consultation with an expert on sleep deprivation seems unnecessary, to say the least, since (1) Gilliam never claimed that he was suffering from sleep deprivation, and (2) Gilliam was alone in a cell for approximately ten hours prior to his tape recorded confession and had ample opportunity to sleep prior to his confession had he been tired.

In his brief, Gilliam alleges the following:

"Specifically, counsel's performance was deficient in the following ways: A) Failing to develop and present mitigation evidence; B) Failure to investigate; C) Failure to prepare witnesses; D) Failure to prepare for sentencing; E) Failure to prepare for trial; F) Failure to advise and make recommendation as to judge or jury trial and sentencing; G) Failure to advise of the advantages of a jury sentencing under *Mills v. Maryland* [486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 348 (1988) ]; H) Failure to advise of the defense of not criminally responsible; I) Failure to prepare for the hearing on Petitioner's motion to suppress; J) Failure, at trial, to argue the voluntariness of Petitioner's statement." (Footnote omitted).

We shall deal with the material aspects of these general allegations and will attempt to do so in what we hope is a more logical order than they are presented in Gilliam's brief.

In reviewing Daneman's representation of Gilliam, we must keep in mind that *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), requires that defense counsel's representation meet "an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. The Sixth Amendment does not require the best possible defense or that every attorney render a perfect defense. In order to be deficient, counsel's acts or omissions must be "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. " '[A] court must

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " *State v. Thomas*, 325 Md. 160, 171, 599 A.2d 1171, 1176 (1992) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95) (citation omitted). The courts should not, aided by hindsight, second guess counsel's decisions.

### A. *The Suppression Hearing*

The primary allegations of ineffective assistance of counsel at the hearing to suppress Gilliam's confession are that (1) Daneman failed to adequately prepare for the hearing; and (2) Daneman failed to prepare Gilliam for his testimony at the hearing. The facts adduced at the suppression hearing are rather simple and straightforward.

Gilliam was arrested in the early morning hours of December 5, 1988, two days after the murder, following a high-speed chase which ended when Gilliam's car collided with a median wall. The police took Gilliam to a local hospital, where he was treated and released to police custody. Prior to being interrogated, he was detained in a holding cell for over ten hours. When his interrogation began over twelve hours after his arrest, Gilliam was asked to read the *Miranda* warnings [1] aloud, and did so. Gilliam also initialed and signed a *Miranda* rights waiver. The interrogation officers testified that Gilliam was coherent, responsive, and did not appear to be suffering from the effects of drugs.

Gilliam testified at the suppression hearing that the only effect his drug use had on him at the time of his confession was that it made him "paranoid" and "uncomfortable." When asked if he understood his *Miranda* warnings when he signed

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the waiver form he replied, "in a way I understood and in a way I didn't."

### 1. Failure to Prepare for the Hearing

■ Gilliam's complaints can be summed up by the statement in his brief that "Daneman failed to develop any evidence relating to Petitioner's drug use or head injury or sleep deprivation as they impacted upon the voluntariness of his statement." Gilliam contends that Daneman failed to obtain information from Trooper Wilson, who was on the scene of Gilliam's automobile accident immediately prior to his arrest and whose accident report characterized Gilliam's head injury as incapacitating, rather than one of the other two types of injury listed on the form, *i.e.*, non-incapacitating or fatal. In light of the assessment of Gilliam's condition at the hospital, we fail to see how Trooper Wilson's assessment of Gilliam's condition would have any probative value. Additionally, Gilliam contends Daneman failed to obtain information from Gilliam's mother and two other witnesses, who could corroborate his physical condition and drug use prior to his arrest. Gilliam ignores or minimizes, however, the following facts. Daneman did consult with Dr. Ramamurthy, a specialist in internal medicine, who upon reviewing the hospital reports detailing Gilliam's medical treatment after his arrest, concluded that it would be difficult to present expert testimony on mental impairment at the time of the confession. The hospital report indicated Gilliam never lost consciousness after the accident and that he was alert and understood what was happening. Gilliam had advised Daneman before the suppression hearing that he "knew what [he] was saying," that "he was not intoxicated" when he confessed, and that he confessed after he was told Kelvin Drummond confessed because he "had the presence of mind to try and establish a defense of accidental shooting." Further, Gilliam did not give his statement to the police until over twelve hours after his arrest and after he had been left alone in a cell for approximately ten hours prior to his interrogation, thus militating against any claim of intoxication or sleep deprivation.

In response to Gilliam's prior contentions about his confession, we have previously stated:

"But even if Gilliam had argued that his waiver was involuntarily given due to prior drug use, we would point out here, as we have in a pre-*Miranda* decision, that as long as a statement is freely and voluntarily given at a time when the accused understands what he is saying, the fact that the accused may be under the influence of narcotics does not necessarily make the statement inadmissible. *Bryant v. State,* 229 Md. 531, 536, 185 A.2d 190, 192–93 (1962). The same would be true for any effects caused by the laceration on his forehead. *See Hadder v. State,* 238 Md. 341, 357, 209 A.2d 70, 79 (1965) (physical injury does not affect admissibility as long as the disclosure is freely and voluntarily made at a time when the accused knows and understands what he is saying)."

*Gilliam,* 320 Md. at 650, 579 A.2d at 750.

Faced with the evidence of the voluntariness of Gilliam's tape recorded confession as well as with Gilliam's tacit acknowledgment of its voluntariness, Daneman did as much as could reasonably be expected. Gilliam has failed to prove Daneman rendered ineffective assistance in his preparation for or representation during the suppression hearing.

## 2. Preparation of Witnesses

Gilliam makes another allegation that relates to the suppression hearing, but also impacts on other aspects of Daneman's preparation. He states: "Perhaps the most telling deficiency in Daneman's performance with respect to the suppression hearing was his complete failure to prepare Petitioner for his testimony." Gilliam expands this allegation to include the trial and sentencing phase and complains that "starting with the suppression hearing and continuing through sentencing, Daneman's complete failure to prepare witnesses severely impaired Petitioner's defense."

Daneman testified that he did have extensive conversations with Gilliam about the suppression issues. Consistent

with the general rule disfavoring unduly influencing witnesses, Daneman indicated that he had adopted a practice of not reviewing specific questions and answers with clients or witnesses. He did, however, adhere to a policy of reviewing the general subject of each witness's testimony. This is all that is required of an attorney. *See State v. Earp,* 319 Md. 156, 170–72, 571 A.2d 1227, 1234–35 (1990) (describing the cloudy line between permissible witness preparation and improper influence of a witness's testimony and cautioning attorneys to "exercise great care to avoid suggesting to the witness what his or her testimony shall be."). Gilliam's general complaint of failure to prepare witnesses is without merit. We shall deal with one, more specific, part of this allegation in part I.C.6, *infra.*

## B. *Trial Errors*

### 1. Failure to Advise and Make Recommendations as to Judge or Jury Trial and Sentencing

█ Gilliam contends that Daneman was deficient in not making a recommendation as to whether he should opt for a court or jury trial and sentencing. At the post conviction hearing, Gilliam called William C. Brennan, Jr., who was qualified as an expert in handling death penalty cases. Mr. Brennan opined that an attorney "has a duty to make a recommendation" as to court or jury trial and sentencing. Mr. Brennan, however, also testified that it would be impossible for him to say what advice Daneman should have given or even if one mode was preferable over the other in the instant case.

Daneman testified that he advised Gilliam at length and on several occasions regarding the decision to elect court or jury trial and sentencing. Daneman further testified that his practice is to tell the client that the ultimate decision must be made by the client. Daneman did not attempt to influence Gilliam's decision by making any recommendation of his own, although Gilliam's mother, Mary Gilliam, apparently recommended to Gilliam that he elect a court trial and court sentencing because she believed Judge Fader was a "religious

person" and would be the fairest possible trier of fact. Gilliam also expressed fear about how a jury would view his crime and ultimately elected a court trial and court sentencing.

■ Election of court or jury trial and/or sentencing is a decision for the defendant. *See* Maryland Rule 4–246; *Bruce v. State,* 328 Md. 594, 602–608, 616 A.2d 392, 396–99 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993). There was no indication that, in the instant case, one would have been preferable over the other and no reason why Daneman should have attempted to influence Gilliam's decision by making a recommendation. We therefore find no ineffective assistance in Daneman's failure to make a recommendation in the instant case as to whether Gilliam should elect to have his trial and his sentencing before a court or jury.

### 2. Failure to Prepare for Trial

■ Gilliam argues that Daneman was deficient in arguing only an accident defense at trial, and not exploring alternative defenses. Although Gilliam initially told Daneman that he shot Ms. Doerfler accidentally, during a subsequent interview prior to trial, however, Gilliam changed his story and told Daneman "it was not an accident, I killed her because she could have identified [Tony]. She saw his face." [2]

At the guilt/innocence trial, Daneman relied on the defense of accident which was consistent with Gilliam's confession to the police. There was never any suggestion that the accident defense was either inappropriate or inadequately presented. Indeed, Gilliam's expert on criminal defense representation, William C. Brennan, Jr., acknowledged that "Mr. Daneman did a pretty good job on the accident defense at trial." Gilliam does not now challenge the accident defense, but claims in his brief that Daneman "failed to make any attempt to develop an alternative defense. . . . Petitioner's initial

---

**2.** Kelvin Drummond testified at Gilliam's trial that "I asked him [Gilliam] why he did it. He said because she saw his face."

claim that the shooting was an accident did not relieve Daneman of his responsibility to investigate and develop all defenses that may be available under the facts and the law."

Gilliam shot Ms. Doerfler in the back of the head with a shotgun after robbing and kidnapping her. He did so in the presence of two witnesses who were in another car some distance away, and he confessed to the police, albeit claiming the gun went off accidently. Daneman was clearly not ineffective because he failed to "investigate and develop an alternative defense." *See Lindsey v. Smith,* 820 F.2d 1137, 1152 (11th Cir.1987) (a defendant "who proposes an alternative trial strategy that would itself have proved futile has failed to demonstrate that the [attorney's] representation at trial fell below an objective standard of reasonableness."), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989); *Jones v. United States,* 512 A.2d 253, 262–63 (D.C.1986) ("Assuming . . . that [an alternative] defense would be a valid defense as a matter of law, counsel's failure to pursue it appears to have been a tactical judgment" and did not constitute ineffective assistance of counsel when such judgment was reasonable). Daneman obviously chose to pursue the best and probably the only legitimate trial defense. The claim that Daneman should have "developed" an alternative trial defense is at best frivolous.

### 3. Failure to Pursue the Defense of Not Criminally Responsible

 Among potential alternative defenses, Gilliam specifically asserts that Daneman should have pursued the defense of not criminally responsible. Daneman's reasons for not pursuing this defense, however, were based, in part, on his discussions with his client. Daneman testified at the post conviction hearing that he and Gilliam "discussed whether he understood what he was doing, could he appreciate what he was doing, and you have to understand that my client told me that what he had done, . . . it was a cold blooded murder." At the pretrial motions hearing, Daneman recited for the record, in Gilliam's presence, that he and Gilliam had jointly decided

not to file a plea of not criminally responsible. As we noted in Gilliam's first appeal: "The record establishes that defense counsel discussed the plea option with his client and that Gilliam was included in the decision to forgo a plea of 'not criminally responsible.'" *Gilliam,* 320 Md. at 665, 579 A.2d at 757.

Even had Gilliam not concurred in the decision, no expert witness has ever opined that Gilliam was, by virtue of a mental disorder, not criminally responsible at the time of the murder. Dr. Ellen McDaniel and Dr. David Shapiro testified to their opinions that Gilliam met the mitigating factor under Maryland Code (1957, 1992 Repl.Vol.), Article 27, § 413(g)(4) that by virtue of a mental disorder Gilliam was "substantially impaired" in his ability to conform his conduct to the requirements of law. Neither expert opined, however, that Gilliam met the statute's test for a finding of not criminally responsible under Md.Code (1982, 1990 Repl.Vol.), Health–General Article, § 12–108, which requires, in relevant part, that at the time of the offense, by virtue of a mental disorder, he "lacks substantial capacity" to conform his conduct to the requirements of law. There is a difference between *lacking substantial* capacity and having *substantially impaired* capacity. The post conviction judge made the following findings of fact:

> "There is no doubt in this Court's mind that the Defendant did not meet the standards of Not Criminally Responsible. The Defendant's confession, Counsel's interviews with the Defendant, a report from Dr. Rubin, discussions with the Defendant's family and lastly the letter from the Defendant himself [admitting he had 'cold bloodedly killed someone'] all support this finding of fact."

Based upon the evidence in the record, we conclude that these findings are not clearly erroneous.

### 4. Failure to Argue Involuntariness of Gilliam's Confession at Trial

Gilliam also claims Daneman's representation was deficient because, after the denial of the motion to suppress Gilliam's confession, Daneman did not raise the issue of volun-

tariness again at trial. Even if this was an oversight on Daneman's part, it in no way prejudiced Gilliam's defense. Judge Fader was the trier of fact both at the suppression hearing and at trial. Judge Fader can be presumed to know the law and to know, even without Daneman reminding him, that a confession cannot be considered by the trier of fact unless it is found to be voluntary beyond a reasonable doubt. *See Brittingham v. State,* 306 Md. 654, 665, 511 A.2d 45, 49–50 (1986). As *Strickland* points out: "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." 466 U.S. at 695, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. We should assume that Judge Fader did not need to be reminded that he could not consider Gilliam's confession unless he found that confession voluntary beyond a reasonable doubt. Thus, Daneman's failure to argue this issue in no way prejudiced Gilliam's defense. We might also note that, in light of the facts, there was little Daneman could argue to Judge Fader in challenging the voluntariness of Gilliam's confession.

### C. *Sentencing Hearing Errors*

Gilliam alleges a number of instances of ineffective assistance by Daneman at the sentencing hearing.

#### 1. Failure to Present Mitigating Factors

Gilliam first suggests that Daneman failed to effectively pursue, at the sentencing hearing, mitigating factors of duress and substantial mental impairment. We note that prior to the death penalty sentencing hearing, Daneman asked Gilliam to put his thoughts about the crime in writing. Gilliam wrote a letter to Daneman which stated in part as follows:

"I'm not sure about how I should start this letter. Even though this letter will not be taken to court with me, I still feel as though I might say the wrong thing. I'm not the young man that I appear to be by my past actions. I am looking at my case from both sides, so please; don't think that I'm crazy. *I have reasons why I think that I should be*

*given the death penalty, and reasons why I shouldn't be
given the death penalty. I've cold bloodedly killed someone.
I had no reason for it, and it's hard for me to deal with the
fact that it's all over.* It's even hard for me to write down
the reasons why I think I should live. I don't want to die,
even though it sounds that way; but I do deserve every bit
of death. I've caused a lot of hurt, just by pulling a trigger
one time. And it doesn't feel good. I will never forget
what I have done." (Emphasis added).

In this letter, Gilliam acknowledges his cold blooded killing
and in no way suggests the mitigating factors of duress or
substantial mental impairment which he now claims Daneman
should have more effectively pursued at the sentencing hear-
ing.

Nonetheless, Daneman's sentencing hearing preparation in-
cluded a review of each of the statutory mitigating factors, as
well as potential non-statutory mitigating factors. Ultimately,
Daneman in fact decided to pursue both duress and substan-
tial mental impairment.

The mitigating factor of duress was generated by a state-
ment Gilliam made to the defense psychologist, David Shapiro,
Ph.D., that Gilliam shot Ms. Doerfler because he was afraid of
what Tony would do to him if he didn't kill her. Daneman
argued duress as a mitigating factor in spite of circumstances
refuting that defense, including (1) in his tape recorded confes-
sion, Gilliam asserted accident, not duress; (2) the day before
the murder, Gilliam stated to the Drummond brothers that he
wanted to "kill a bitch"; (3) Gilliam never alleged to anyone
that Tony directly ordered him to kill Doerfler; and (4) it is
difficult to infer that Gilliam, armed with a sawed-off shotgun,
was acting out of fear of an unarmed friend who was sitting in
a car some distance away.

As for the defense of substantial mental impairment, Dane-
man also presented evidence at the sentencing hearing of the
mitigating factor that Gilliam committed the murder while his
capacity to appreciate the criminality of his conduct or to
conform his conduct to the requirements of law was substan-

tially impaired as a result of mental disorder and drugs. Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 413(g)(8). Dr. Shapiro testified that there was a "substantial impairment" of Gilliam's ability to conform his conduct to law "based on the combination of unstable personality disorder and the ingestion of drugs."

There was no other available evidence that Gilliam was substantially impaired because the two psychiatrists retained to examine Gilliam, Dr. Neil Blumberg and Dr. Ellen McDaniel, told Daneman prior to the sentencing hearing that they could not express an opinion as to the existence of such substantial impairment, and they were not called as witnesses. Dr. Blumberg explained to Daneman before the sentencing hearing that Gilliam's acknowledgment of complete awareness of his act of murder precluded any conclusion that Gilliam's ingestion of drugs was a significant factor in the killing. Dr. Blumberg told Daneman: "The Defendant did consider some alternatives because he stood outside of the car with a gun for one and one-half minutes thinking of what to do before he shot the young girl." Dr. Blumberg also advised Daneman that "this case is a cold blooded execution. Intoxication played a part, but unfortunately he was not under duress or intimidated," and "he can't mitigate on the grounds of substantial impairment."

Thus, in spite of Gilliam's claim to the contrary, Daneman did present evidence on the mitigating factors of duress and substantial mental impairment and pursued those factors to the extent possible.

## 2. Daneman's Lack of Death Penalty Litigation Experience and Failure to have Co–Counsel

Gilliam's claim seems to be that Daneman had insufficient death penalty litigation experience, although he acknowledges that Daneman was an experienced defense counsel. In his brief, Gilliam alleges:

"Daneman, sole counsel at trial and sentencing, and inexperienced in death penalty litigation, failed to conduct legal research on the issue of mitigation, stating that his legal

research was 'in his brain.' Daneman did not begin to contemplate the sentencing phase of Petitioner's trial until after the guilty verdict." (Footnotes omitted).

■ Daneman has been a member of the bar since 1961 and engaged in the practice of criminal law since his admission to the bar. He has been involved in "thousands" of cases and lectured for the Department of Justice. Daneman had represented a previous client in a murder case where the death penalty notice was sent by the State. The post conviction hearing judge found that "[b]ased upon all of the evidence and testimony this Court finds as a fact that defense counsel was experienced and more than competent to handle a capital case." This finding is well supported in the record.

■ Gilliam's expert witness opined that representing a defendant in a capital murder without a "second chair" was inadequate representation as a matter of law. We disagree and further note that Daneman had more than adequate assistance. Daneman received assistance from a law clerk as well as from an associate in his law firm. Daneman also received substantial assistance from the Capital Defense Division of the Office of the Public Defender. This assistance included advice from other attorneys, assistance in retaining at least three experts, and a psychological family background assessment. All that *Strickland* requires is that a criminal defendant receives competent representation, falling within a professional standard of reasonableness. We find that Gilliam received such representation. Gilliam cites no case that recognizes a right to multiple counsel, and we refuse to create such a requirement. As long as a defendant receives adequate representation, it may be provided by a single attorney acting without a "second chair" at trial.

As for Gilliam's contention that Daneman failed to conduct legal research on the issue of mitigation, there was ample evidence that Daneman did an adequate review of potential mitigating factors, and there is no indication that additional legal research would have produced any additional mitigating factors.

As for Gilliam's contention that Daneman did not begin to contemplate the sentencing phase of Gilliam's trial until after the guilty verdict, this was expressly refuted by Daneman. In fact, Daneman produced an internal office memorandum dated approximately one month before the commencement of the guilt/innocence trial which reviewed mitigation theories. We also note that, between the trial and sentencing, Daneman had five months to prepare for the sentencing hearing.

Finally, Gilliam contends that "Daneman's failure to investigate also prevented him from establishing during the guilt/innocence phase evidence which would have supported mitigating circumstances at sentencing, namely, substantial impairment and duress." We have already noted that Daneman was justified in emphasizing only the defense of accident at Gilliam's trial. *See* Part I.B.2, *supra.*

### 3. Failure to Advise of the Advantages of a Jury Sentencing Under *Mills v. Maryland*

Gilliam contends Daneman failed to adequately advise him of the advantages of a jury sentencing under *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), in which the Supreme Court held that a jury must weigh aggravating against mitigating factors when even one juror finds that a mitigating circumstance exists. Although now presented in a somewhat different fashion, this argument has already been decided in Gilliam's first appeal. On direct appeal, Gilliam contended that the trial judge failed to properly advise him of the effect of *Mills v. Maryland.* Specifically, Gilliam contended that he should have been told that "if some, but less than all, of the jurors believed that at least one mitigating factor existed and was not outweighed by the aggravating factor(s), the result would be a deadlocked jury. Once deadlocked, the jury could not impose a sentence of death." *Gilliam,* 320 Md. at 662, 579 A.2d at 756. The record reflects that the trial judge did advise Gilliam that, if the jury became deadlocked or could not reach a decision in a reasonable amount of time, the sentence could not be death. With

respect to Daneman's advice to Gilliam, we also stated in Gilliam's first appeal:

> "[T]he record is clear that Gilliam discussed the significance of the *Mills* decision with his attorney, as well as its effect on his election to be sentenced by the court. Before trial, when Gilliam was to elect whether to be tried by the court or by a jury, the trial court instructed him on the *Mills* decision. The court then asked if Gilliam understood the instruction and the record shows the following:
>
> 'THE DEFENDANT: Yes, sir.
>
> THE COURT: All right. Mr. Daneman, I take it you have been over this with your client before?
>
> MR. DANEMAN: I have.'
>
> At no time did defense counsel object to the court's *Mills* instruction. Further, it is clear that Gilliam's attorney had already thoroughly instructed him on the matter. Therefore, absent clear evidence that Gilliam was in doubt about the effect of *Mills* on his election to be tried and sentenced by the court, we presume that he was fully informed by his counsel. The ambiguity, if any, in the judge's explanation of *Mills* does not undermine the judge's finding of a knowing and voluntary election to be sentenced by the court."

*Id.* at 663–64, 579 A.2d at 757. At the post conviction hearing, Gilliam did not testify, and he failed to establish that Daneman was incorrect when he represented to the trial judge that he advised Gilliam of the significance of the *Mills* decision and the factors to be considered in electing a court or jury sentencing.

#### 4. Testimony of Arneisha James and Lisa Brown

■ A claim of ineffective assistance of counsel that relates primarily to the sentencing hearing, but which Gilliam also raises as a trial error, is Daneman's alleged failure to present favorable testimony from Arneisha James and Lisa Brown. Gilliam suggests that these two women, who saw him shortly before the murder, could have provided helpful information about his drug use and possible drug intoxication, as

well as testimony that his crime was mitigated because he was acting under duress from Tony Drummond. The post conviction hearing judge found, in effect, that there was nothing to suggest James' and Brown's testimony would have been exculpatory or favorable to Gilliam. That finding was not clearly erroneous. *See United States v. Muehlbauer,* 892 F.2d 664, 669 (7th Cir.1990) (attorney's failure to call two witnesses that defendant claimed were critical did not constitute ineffective assistance of counsel where there was nothing in the record to suggest that witnesses would have helped exonerate defendant).

Arneisha James and Lisa Brown gave statements to the police in which they described a visit that Gilliam, Tony Drummond, and Kelvin Drummond made to James' apartment shortly before the murder. In their statements, they indicated that, while in the apartment, Tony had the shotgun. This was consistent with Kelvin Drummond's testimony at Gilliam's trial that Tony Drummond had possession of the shotgun while the group was at James' apartment and Tony asked James' permission to put the shotgun in her closet during their visit. Tony Drummond's brief possession of the shotgun at James' apartment in no way establishes that Gilliam was acting under duress. It was uncontroverted that the shotgun belonged to Gilliam and that Gilliam had possession of the shotgun at the time of the murder and several days after the murder. Gilliam shot the victim while Tony and Kelvin Drummond were some distance away, unarmed, and in another car. Tony Drummond's possession of the shotgun at James' apartment was testified to by Kelvin Drummond and was uncontroverted. There was no reason why Daneman should have called James and Brown to corroborate Kelvin Drummond's testimony on this issue. *See Proctor v. United States,* 729 F.Supp. 473, 476 (D.Md.) (rejecting ineffective assistance of counsel claim where presentation of evidence defendant claimed was "vital" would have merely been cumulative), *aff'd sub nom.* 911 F.2d 721 (4th Cir.1990), *cert. denied,* 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 697 (1991). Additionally, neither James nor Brown could aid in establishing the possibly

mitigating factor of drug impairment.[3] In her statement, James made mention of some of the group smoking marijuana, but made no mention of other drugs and gave no indication that Gilliam was exhibiting any signs of drug impairment, although she did indicate Tony Drummond, by contrast, was sick and lying down during the visit. At the post conviction hearing, James was called as a witness, but gave no indication that either she or Brown saw any signs that Gilliam was impaired by drugs. There was no showing that either James or Brown could have added anything of substance to either Gilliam's duress claim or his substantial impairment claim.

Gilliam also contends that James could have testified about a letter Tony Drummond wrote to her in which he asked her not to tell anyone that he was wearing a white ski suit or that he had the gun at her apartment. Gilliam contends this letter shows Tony Drummond dominated the group and indicates Gilliam was therefore acting under duress. The short answer is that Tony Drummond's letter to Arneisha James may have suggested he dominated James; it does not suggest he dominated Gilliam. The letter quite simply is not admissible evidence to establish that Gilliam was acting under duress.

### 5. Psychosocial Family Background Investigation

Gilliam claims, "Daneman did not conduct, nor did he hire anyone to conduct, an investigation into Petitioner's family background. Instead, he relied upon interviews conducted by [graduate] social work students from the University of Maryland. The students interviewed Petitioner's mother, sister, aunt and a friend." The graduate students also interviewed Gilliam on six occasions, and from these interviews

---

**3.** While not an enumerated mitigator in Maryland Code (1957, 1992 Repl.Vol.), Article 27, § 413(g), drug-related impairment might be considered a mitigating factor under § 413(g)(8), which allows the jury to consider "any other facts" that it finds as mitigating circumstances in the case. *See Booth v. State,* 327 Md. 142, 168–76, 608 A.2d 162, 174–79 (discussing intoxication as a viable mitigator under § 413(g)(8)), *cert. denied,* —— U.S. ——, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992).

prepared a twenty-two page psychosocial report which was admitted at the sentencing hearing.

Following the sentencing hearing and in preparation for the post conviction hearing, the Office of the Public Defender hired Mr. Hans Selvog, an expert with a Master's Degree in social work, to review the first psychosocial history and to do a second psychosocial investigation of Gilliam's family background. This second psychosocial investigation contained the following:

"Throughout the initial four years of his life, Tyrone Gilliam Jr. witnessed extreme violence between his parents. Both his mother and father were capable of inflicting injury and their fierce and unpredictable outbursts created a home environment that was threatening, confusing and insecure. Further, the ongoing violence between the parents elicited the constant fear from Tyrone Jr. and his sister that at any moment they too might suffer the same brutalization.

After his parents' final separation, which followed a particularly explosive episode, Tyrone Jr.'s existence became even more unstable as he moved with his mother and sister to many different residences during the next four years. And the trauma he had suffered when his parents were together did not end after their separation; he continued to be subjected to a fearful and brutal environment while cared for at his maternal grandmother's home. Here his step-grandfather viciously abused his wife, children and grandchildren. And on top of this were the constant sexual attacks Tyrone Jr. was subject to in this house and as well as at the hands of a babysitter."

Gilliam now challenges the adequacy of the twenty-two page psychosocial report prepared by the graduate students from the University of Maryland School of Social Work. That report states, incidentally, that the graduate students who compiled the report "worked in conjunction with the Death Penalty Defense Unit of the Office of the Public Defender, Baltimore City."

Gilliam has failed to show that Daneman's representation in conjunction with securing a psychosocial family background investigation was inadequate. Daneman had a right to rely on, and did rely on, the graduate social work students in connection with the volunteered assistance of the Public Defender's Office. The twenty-two page psychosocial report they sent to Daneman did not appear to be inadequate. Even if counsel who fails to investigate a capital defendant's background might be deemed ineffective, *see, e.g., Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.), *cert. denied,* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989), Daneman met his obligation by securing a background investigation by the graduate students recommended by the Office of the Public Defender. *Cf. Mitchell v. Kemp,* 762 F.2d 886, 889–90 (11th Cir.1985), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987). Further, even if we were to assume the graduate student's psychosocial family background investigation was inadequate, Gilliam was not denied any constitutional right and is not entitled to a new sentencing. *See Poyner v. Murray,* 964 F.2d 1404, 1418–19 (4th Cir.) (claim of ineffective assistance of expert witness does not assert a cognizable constitutional violation), *cert. denied,* —— U.S. ——, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992).

### 6. Failure to Prepare Sentencing Witnesses

▇▇ We have already dealt with the general allegation of Daneman's failure to prepare witnesses in part I.A.2, *supra.* In his brief, Gilliam complains specifically about Daneman's failure to prepare Dr. Shapiro, a psychologist who testified at Gilliam's sentencing to his opinion that Gilliam was "substantially impaired" at the time of the murder. Gilliam's specific allegations regarding Dr. Shapiro's testimony are as follows:

> "Although Daneman knew that Shapiro, a psychologist, anticipated having a limited role in the sentencing presentation, Daneman never informed him that the psychiatrist upon whom he relied, Dr. McDaniel, had declined to testify. Despite the fact that Shapiro had, at Daneman's request, prepared a memorandum suggesting questions for Daneman

to ask, Daneman asked the one critical question that Shapiro was not prepared for, namely, whether Petitioner was 'substantially impaired' at the time of the crime. Shapiro answered that he was but explained at the post conviction hearing that, had he known that question would be asked of him, Shapiro would have insisted on 'substantially more interviews' and investigation on which to base his opinion. Even worse was Daneman's failure to advise Shapiro that if Shapiro testified, the State would rebut his testimony with that of Dr. Siebert, who would testify that Petitioner was antisocial and dangerous. Had Shapiro known that Siebert would so testify, he would have advised Daneman not to call him as a witness."

Daneman was able to elicit a favorable opinion in mitigation of sentence from Dr. Shapiro that Gilliam was substantially impaired at the time of the murder. This was an opinion that up to that point no other expert was able to express, as well as an opinion to which Dr. Shapiro had not anticipated testifying. We fail to see how Daneman rendered ineffective assistance in the manner in which he elicited this favorable opinion from Dr. Shapiro.

### 7. Dr. Ellen McDaniel

As previously noted, after trial, but before sentencing, Daneman requested assistance from the Public Defender's Office. The Public Defender hired Dr. Ellen McDaniel, a psychiatrist. Shortly after the Office of the Public Defender contacted Dr. McDaniel, she sent a letter to Daneman requesting Gilliam's Juvenile Service reports, school records, information about the offense, family history, etc. Dr. McDaniel was supplied with the pre-sentence investigation, Dr. Shapiro's report, offense reports of the murder, Gilliam's statements to the police, as well as the twenty-two page report prepared by the graduate social work students. She interviewed Gilliam on two occasions. Dr. McDaniel's sole contact with Daneman was on October 23, 1989, when she called Daneman and told him that she could not come to any conclusion that would be helpful to Gilliam at his sentencing.

According to a contemporaneous memorandum of that telephone conversation made by Daneman and introduced as an exhibit, Dr. McDaniel told him that Gilliam was not psychotic, but is somewhat aggressive with a "chip on his shoulder." The memo also indicates Gilliam told Dr. McDaniel four different stories as to what occurred but that he never indicated that he was afraid of Tony. Dr. McDaniel testified that she did not remember asking Daneman for any additional information during that telephone conversation, but she assumes she did. Daneman does not recall any request for additional information, and the memorandum of his conversation with Dr. McDaniel indicates no such request.

Following the court's imposition of the death penalty, the Public Defender's Office again retained Dr. McDaniel and sent her a copy of the new psychosocial history prepared by Hans Selvog. Dr. McDaniel interviewed Gilliam one more time and interviewed Gilliam's mother and sister.

At the post conviction hearing, according to Gilliam, Dr. McDaniel made it clear that, had Daneman supplied her with the background information reported by Selvog, she would have rendered an opinion at the time of Petitioner's sentencing that Gilliam had a paranoid personality disorder and was substantially impaired in his ability to conform his conduct to the requirements of law. There is some question about how much weight should be given to Dr. McDaniel's newly formed opinion founded on the second psychosocial history, an opinion that she was previously unable to form from her interviews with Gilliam, the first psychosocial history, and the other reports furnished by Daneman. Dr. McDaniel testified that, based on the information she had prior to receiving the Selvog psychosocial history, "I was able to state he [Gilliam] had a personality disorder, but I was not able to state he had a *paranoid* personality disorder, much less to say that he was substantially impaired." (Emphasis added). In fact, the first psychosocial report, which Daneman furnished Dr. McDaniel, specifically observed that "[w]e conclude from the information gathered in this report that Defendant Gilliam has a ... somewhat paranoid personality." In addition to this first

psychosocial history, at the time Dr. McDaniel told Daneman she would be unable to supply any helpful information, she also had reviewed Dr. Shapiro's written report containing test results showing evidence of Gilliam's paranoia. Thus, Gilliam's paranoid personality was not revealed for the first time in Mr. Selvog's psychosocial history.

■ We have already held that there was no inadequate representation because Daneman did not obtain a better psychosocial history. It follows that there was no breach in the standard of care by not furnishing Dr. McDaniel with information disclosed by the second psychosocial history which was the foundation for the opinion Dr. McDaniel formed after Gilliam's sentencing and to which she testified at the post conviction hearing. If Gilliam's childhood was vital to Dr. McDaniel's psychiatric assessment, Daneman could assume Dr. McDaniel would elicit this information from Gilliam. If additional interviews with Gilliam's family members were important in forming her psychiatric opinion, Daneman could assume that Dr. McDaniel would take the initiative and request those interviews. Gilliam also has not established any inadequate representation because Daneman failed to initiate further meetings with Dr. McDaniel after her October 23rd representation that she was unable to provide any information that would be helpful at sentencing. He has no obligation to pursue her and try to convince her to change her mind.

### D. Additional Allegations

We recognize that Gilliam makes passing reference to other instances not discussed herein which he suggests might illustrate Daneman's inadequate representation, such as how Daneman phrased questions to several witnesses. Those were not overlooked; they were, however, so insignificant or devoid of merit that we deemed them unworthy of further comment.

### E. The "Cumulative Effect" of the Ineffective Assistance Claims

■ Gilliam also contends the "cumulative effect" of his ineffective assistance claims should entitle him to post convic-

tion relief. In the instant case, we see no basis to conclude that Gilliam's claims collectively have any greater force than they have individually. *Compare Bowers v. State,* 320 Md. 416, 436–37, 578 A.2d 734, 744 (1990) (cumulative effect of related claims was sufficient to establish ineffective assistance of counsel). This is not a case where the cumulative effect of numerous interrelated errors in aggregate amount to inadequate representation. This is more a case of the mathematical law that twenty times nothing is still nothing.

## II. Suppression of Exculpatory Material

 Citing Maryland Rule 4–263(a)(1) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Gilliam contends that the State failed to turn over material which was exculpatory in nature. Specifically, Gilliam contends that the State failed to turn over the statements of Arneisha James, the statement of Lisa Brown, the police report of Trooper Wilson, and the letter from Tony Drummond to Arneisha James.

Although Daneman did not recognize these documents when shown them at the post conviction hearing some three years after the trial, it is by no means clear that he had not been provided these documents by the State. The post conviction judge found that Daneman had two meetings to review the State's file, and it was stipulated that the documents at issue were in the State's file prior to trial. It was also conceded that it is the policy of the Baltimore County State's Attorney's Office to give open file discovery. Moreover, Daneman testified at the post conviction hearing that he and the prosecutor met and "I went through everything." He further testified, "I know I had to look through their file. . . . No, the State gave me everything I wanted." Daneman's failure to recognize the documents three years later does not require the trial judge to find that they were withheld by the State. The trial judge's finding that Daneman was given access to the disputed documents was not clearly erroneous.

■ Even if these documents had not been furnished by the State, from our previous discussion about these specific items, *see* parts I.A.1 and I.C.4, *supra,* it is clear that none of these documents constitute "material evidence" whose suppression would require a new trial. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *Thomas,* 325 Md. at 190, 599 A.2d at 1185.

## III. The Post Conviction Judge Employed An Incorrect Standard in His Assessment of Daneman's Representation

■ Gilliam complains that the trial judge incorrectly articulated the standard for determining whether counsel's inadequate representation prejudiced the defense. The simple answer to this contention is that it is irrelevant, because:
"a defendant who hopes to show that counsel was ineffective ... has the burden of persuading a court that:
(1) counsel's performance was deficient, *and*
(2) the deficient performance prejudiced the defense."
(Emphasis in original).
*Bowers,* 320 Md. at 424, 578 A.2d at 738 (citing *Harris v. State,* 303 Md. 685, 696, 496 A.2d 1074, 1079 (1985)).

In light of this two-prong test, even if the post conviction judge's articulation of the standard for evaluating whether an attorney's deficient performance prejudiced the defense was incorrect, any error was harmless. The judge did not find, as we do not find, that Daneman's representation was deficient. The first prong of the test was not met. Therefore, what standard would be used to measure prejudice, had Daneman been deficient, is simply irrelevant.

## IV. The Post Conviction Judge Relied on Facts Outside the Record

■ Gilliam contends that the post conviction judge improperly relied upon extrinsic facts outside of the record in

denying post conviction relief. In particular, he refers to the post conviction judge's written opinion, in which the judge stated:

"This Court knew defense counsel as an active practitioner, well before being appointed to the bench, and during the past six years has had Mr. Daneman before this Court for many cases, both pleas and trials."

Gilliam argues that there was no evidence in the record to support this statement and, therefore, that the court was incorrect in relying upon it in assessing Daneman's competence. It is clear that the judge did not rely on his prior contacts with Daneman as a basis for the finding that Daneman was competent. The post conviction judge, in his opinion, took note of the testimony at the post conviction hearing that Mr. Daneman had been admitted to the Maryland bar in 1961 and had actively been engaged in the practice of criminal law since then; that Mr. Daneman had been involved in thousands of cases and had lectured for the Department of Justice; that Mr. Daneman kept updated on the latest cases; that he was assisted by a law clerk, an associate, and Jerome Deise, the Chief of the Capital Litigation Unit of the Public Defender's Office; that he had consulted with an array of experts in preparing the case; and that he had previous experience in death penalty litigation. The court then concluded, *"[b]ased upon all of the evidence and testimony* this Court finds as a fact that defense counsel was experienced and more than competent to handle a capital case." (Emphasis added). It is obvious that "all of the evidence and testimony" adduced regarding Daneman's experience and competence was what the judge relied on. We must also keep in mind that whether Mr. Daneman was *generally* experienced and competent has very little to do with Gilliam's specific claim of ineffective assistance. A claim of ineffective assistance of counsel succeeds or fails depending *not* on the overall qualifications of the attorney, but rather on careful examination of *particular* allegations of error that supposedly affected the result of the proceeding at issue. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

## V. The Post Conviction Judge's Factual Findings Were Clearly Erroneous

Gilliam's next contention is that several of the post conviction judge's findings of fact were clearly erroneous. Most of these findings were discussed in previous portions of this opinion. The remaining contentions are as follows:

### A.

■ The post conviction judge found that Daneman was assisted by an associate. In claiming that this finding was erroneous, Gilliam relies on a portion of the transcript early in Daneman's testimony at the post conviction hearing where when asked if he was assisted by an associate, Daneman said, "I don't think so." The short answer to this contention is that Mr. Daneman later corrected the testimony that Gilliam relies upon and testified, "I was incorrect in my prior testimony, after reviewing the memos, she [Leslie Leader, Mr. Daneman's associate] did work on this case." Mr. Daneman testified that his memory was refreshed by looking at various memoranda and at the log he had prepared for the hearing, but he could not specifically recall what role Leader played. Daneman was able to recall, however, that Leader tried a portion of the case in Harford County that involved other armed robberies and the same confession admitted in this case; that Leader had sent Gilliam jury instructions at his request; and that Leader had discussed this case with Gilliam on March 13 and April 13, 1989. On the State's examination, Mr. Daneman confirmed that both Leader and a law clerk had assisted him on the case. The post conviction court's finding that Mr. Daneman was assisted by an associate is not clearly erroneous.

### B.

■ Gilliam argues that the post conviction judge was clearly erroneous in finding that "Mr. Daneman had previously tried a death penalty case in Anne Arundel County Circuit

Court twice." The record reflects Daneman testified as follows:

"Q. What was the number of death penalty cases you had handled prior to Tyrone Gilliam?

A. I had not tried a full death penalty case prior to the Gilliam case. I did represent an inmate in Annapolis who had killed a fellow inmate, but I tried the murder case twice, both times it was hung, and then they nol prossed the case. So, I did not go to the second phase.

Q. Okay, but that was a death penalty case?

A. Yes.

Q. What was the name of the Defendant in that case?

A. Clyde Dixon. I spoke to Mr. Dixon about two weeks ago, because I don't have the file, and he, I asked him about the case. He refreshed my memory, and he told me, yes, they were going to the death penalty. Now, that's my only recollection of that case, I must tell you.

Q. That's still continuing?

A. No, no, it's finished. It's over with. It was just an old case. I didn't go back into my files to pull out that file to see what was done with regard to the death penalty phase; I must tell you, I didn't."

The trial court's finding that Mr. Daneman had twice before tried a death penalty case in Anne Arundel County was thus supported by the record.

## C.

■■■ Gilliam contends that he wanted Arneisha James and Lisa Brown to be called as witnesses at trial, but Daneman did not call them. He now alleges that the post conviction judge was clearly erroneous in finding in his written opinion that Gilliam "has not alleged one witness that he wanted called...." While the record indicates that, prior to trial, Gilliam and Daneman discussed Arneisha James and Lisa Brown, there was no testimony that Gilliam wanted these two women called to testify. Thus, the lower court's findings were not clearly erroneous.

## VI. Restricting the Testimony at the Post Conviction Hearing

Gilliam contends that the post conviction judge improperly restricted the testimony of his witness, Hans Selvog. Mr. Selvog, a social worker with a Master's Degree in social work, prepared the second post-sentencing psychosocial history. Gilliam's specific contention is that the court erred in refusing to admit Selvog's opinions and in refusing to allow Selvog to draw comparisons between his report and that done by the University of Maryland social work team in 1989. Neither action by the court was error.

 Gilliam's contention that Selvog should have been allowed to state his conclusions has not been preserved for appellate review. After some discussion regarding the extent to which the court might allow Selvog to testify, the prosecution agreed to allow Selvog to introduce his report into evidence with the exception of the portion containing his opinions. In response, Gilliam's post conviction counsel stated, "Your Honor, I have no problem deleting the last two pages and anything within the report that would allude to a conclusion on the part of Mr. Selvog. I would, however, like the opportunity to at least go through ... at least the personal history of Tyrone Gilliam, Junior." The Court thereafter admitted Selvog's report "minus any conclusions or opinions rendered." As Gilliam did not object to the course of action proposed by the prosecution and taken by the court, and apparently indicated his agreement with it, he cannot now be heard to complain that the court's action was wrong. *See* Md.Rule 8–131(a); *White v. State*, 324 Md. 626, 640, 598 A.2d 187, 194 (1991).

 In any case, we are not directed to any specific opinions or conclusions which Gilliam claims were erroneously excluded. Gilliam offered Selvog only to provide a basis for Dr. McDaniel's subsequent opinion; therefore, Selvog's compilation of Gilliam's psychosocial history was all that was relevant. We would also point out that the post conviction judge,

as trier of fact, is not obliged to give credence to any of Mr. Selvog's opinions.

Further, the judge did not abuse his discretion in refusing to allow Selvog to compare his report with the social history report done for the sentencing hearing. As the post conviction judge stated, he needed no assistance to ascertain whether, and how, the two reports differed. Expert testimony may be excluded when it will not aid the trier of fact. *I.W. Berman Properties v. Porter Bros., Inc.*, 276 Md. 1, 14, 344 A.2d 65, 74 (1975); *see also State v. Allenwalt*, 308 Md. 89, 101, 517 A.2d 741, 747 (1986); L. McLain, *Maryland Evidence* § 702.1, at 218 ("Expert testimony also will be inappropriate when the expert can add nothing to what the judge or jurors already know or could infer from the evidence."). Finally, the court properly foreclosed Selvog from reiterating and summarizing the report that was already in evidence, as such testimony would have been cumulative. The post conviction judge therefore did not abuse his discretion by the manner in which he restricted Selvog's testimony.

## VII. Failure to Make Rulings

Gilliam's final contention is that "[t]he post conviction court failed in its duty to set forth, with precision, each contention of the Petitioner, a ruling thereon and the reasons therefor," citing Md.Rule 4–407(a). *See also Davis v. State*, 285 Md. 19, 36–37, 400 A.2d 406, 414–15 (1979); *Duff v. Warden*, 234 Md. 646, 648, 200 A.2d 78, 80–81 (1964).

While we might have preferred that the post conviction judge's "findings of fact and rulings" be set out more fully, there is no reason to remand for additional rulings. We are able to decide all of the issues raised on this appeal based on the record without the need to remand for additional factual findings. *Cf. State v. D'Onofrio*, 221 Md. 20, 155 A.2d 643 (1959). In fact, we have previously addressed all issues on which Gilliam claims the trial judge failed to make a ruling, but one.

Gilliam complains that the trial judge failed to rule on his contention that his appellate counsel was inadequate. Ap-

pellate counsel's alleged inadequacy in his first appeal was the failure to raise on appeal the issue that Gilliam did not knowingly and intelligently waive a jury trial because there was no showing that he had been told he had the right to have a jury decide whether he was not criminally responsible. The contention is that "[a]lthough the trial court extensively questioned Gilliam about jury trial waiver with respect to guilt-innocence as well as sentencing, the record is devoid of any voir dire regarding the right to have a jury decide [whether Gilliam was not criminally responsible by reason of insanity]." The post conviction judge made no finding on this contention. It is obvious that the contention has no merit. As we have already indicated, *see* part I.B.3, *supra*, the record reflects that Gilliam had elected not to file a plea of not criminally responsible and there was no basis for such a plea. There was no reason why the trial judge should, in securing a waiver of jury trial, "voir dire" Gilliam regarding the right to have a jury determine the defense of not criminally responsible by reason of insanity when that defense was not raised.

For the reasons indicated, the petition for post conviction relief was properly denied.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY AFFIRMED.**